### CHAUTAUQUA INSTITUTION v. ZIMMERMAN et al.

(Circuit Court of Appeals, Sixth Circuit. May 12, 1916.)

No. 2753.

1. APPEAL AND ERROR ⬞1010(1)—REVIEW—ACTION TRIED TO COURT.

Where an action at law is by stipulation tried to the court without a jury, under the provisions of Rev. St. §§ 649, 700 (Comp. St. 1913, §§ 1587, 1668), the findings of fact made by the court are not reviewable by an appellate court, if there is any competent evidence on which they could have been made.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3979–3981; Dec. Dig. ⬞1010(1).]

2. APPEAL AND ERROR ⬞977(1)—REVIEW—RULING ON MOTION FOR NEW TRIAL.

In the federal courts, the ruling on a motion for new trial is not reviewable.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 3860; Dec. Dig. ⬞977(1).]

3. EVIDENCE ⬞498½—OPINION EVIDENCE—GROUNDS FOR ADMISSION.

Admission of the opinion of a witness, who was in a position to form an intelligent estimate as to the proportion of the total number of subscriptions to a magazine in a given year which had been secured by plaintiff and defendant, respectively, *held* within the discretion of the court, where it was practically impossible to ascertain the precise number secured by each.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2290, 2291; Dec. Dig. ⬞498½.]

4. SET-OFF AND COUNTERCLAIM ⬞29(1)—BREACH OF CONTRACT—RIGHT TO RECOVER FOR PART PERFORMANCE.

By a contract denominated a lease, plaintiff turned over to defendants for a term of years the publication of a magazine. The contract pro-

---

⬞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

vided that, in case the property should revert to plaintiff, it should pay to defendants a sum based on the number of subscriptions obtained by defendants during the preceding year. After a number of years defendants refused to further perform the contract, and the property and business were taken over by plaintiff. *Held,* in an action by plaintiff to recover for breach of the contract, in which it was awarded the damages claimed, that defendants were entitled to recover, by way of counterclaim, the sum stipulated in the contract for subscriptions.

[Ed. Note.—For other cases, see Set-Off and Counterclaim, Cent. Dig. § 49; Dec. Dig. &#8258;29(1).]

In Error to the District Court of the United States for the Western Division of the Southern District of Ohio; John E. Sater, Judge.

Action at law by the Chautauqua Institution against John L. Zimmerman, John M. Good, and the Popular Education Publishing Company. From the judgment, plaintiff brings error. Affirmed.

M. L. Buchwalter, of Cincinnati, Ohio, for plaintiff in error.

J. W. Keifer and J. L. Zimmerman, both of Springfield, Ohio, for defendants in error.

Before KNAPPEN and DENISON, Circuit Judges, and EVANS, District Judge.

EVANS, District Judge. The plaintiff, on May 9, 1910, instituted this action in the Circuit Court of the United States for the Southern District of Ohio to recover $12,224.75 damages alleged to have been sustained by it from divers breaches by the defendants of the stipulations of a contract in writing entered into on April 24, 1902, between the plaintiff (called therein the first party) and the Floral Publishing Company (called the second party), and of other agreements which supplemented and enlarged it. So far as they are material to the question before us, the provisions of the first contract are as follows:

"First. That said first party does hereby lease to the second party the exclusive right to print and publish the official monthly magazine of said first party, now known as the Chautauquan Magazine, beginning with the October number, 1902. * * *

"Second. That the term of this lease shall be ten (10) years from the date on which full possession and enjoyment, by said second party, of said leased property shall begin. * * *

"Third. That the bona fide circulation of the magazine shall be the number of copies sold or subscribed for by responsible persons, and this circulation shall be taken and held to be, at all times during the life of this lease, as the unit of value in calculating and determining all rentals and reversionary interests hereunder. The basis of such unit of value shall be twenty-five thousand ($25,000) dollars for each ten thousand (10,000) such bona fide circulation, and pro rata for all circulation above or below said ten thousand. There shall be no rental whatever paid by said second party to said first party for the first five years of the original term hereof, except as transportation clause in article 10 may be considered as such. For the second five years of the original term hereof, said second party shall pay said first party in full of all rentals hereunder, in addition to the transportation referred to in article 10 hereof, such sum of money annually as shall equal four (4) per cent. of the value of the average monthly circulation for the twelve months immediately preceding the date of settlement hereinafter provided for, furnished by said first party, or said magazine, in such rental year, the said value being ascertained as above provided. And that, for each year of this lease beyond said original term of ten (10) years, said second party shall pay said first party, in full of all rentals for such renewal term of this lease in addi-

tion to the transportation aforesaid, such sum of money annually as shall equal six (6) per cent. of said value calculated and determined as aforesaid. That all subscriptions mailed to and received by the general offices of said first party shall be credited to it and all subscriptions mailed to and received by said second party shall be credited to said second party. Said second party shall enter all subscriptions, secured by said first party, on the printed mailing list of said magazine with some distinguishing mark attached and give said first party a reasonable time in which to compare the printed proof of such list (which shall be furnished to said first party by said second party) with the original orders of such subscriptions, to the end that said first party may learn that due credit has been given to it for such subscriptions.

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

"Twelfth. That in case the rights and property leased hereunder should ever revert to said first party, said first party shall pay said second party the sum of twenty-five thousand ($25,000) dollars for each ten thousand (10,000) average monthly circulation secured by said second party for the preceding twelve months, and in the event the total number of such average circulation shall be greater or less than ten thousand (10,000), then said first party shall pay said second party such sum as shall bear the same proportion to said sum of twenty-five thousand ($25,000) dollars as the number of said subscriptions shall bear to ten thousand."

Under date of November 16, 1903, the parties to that contract entered into another agreement whereby John L. Zimmerman and John M. Good took the place of the Floral Publishing Company in the lease. After reciting that it was the desire of all the parties to make the substitution the Floral Publishing Company, with plaintiff's consent, assigned to Zimmerman and Good all its rights in the original contract, and Zimmerman and Good covenanted with plaintiff to keep and perform all the covenants, undertakings, and agreements of the Floral Publishing Company specified therein.

On January 20, 1904, the plaintiff and John L. Zimmerman and John M. Good made a further agreement, but no part of it appears to have any bearing upon the questions before us, except those which are precisely similar to those to be copied from the contract next to be mentioned.

On October 15, 1904, the plaintiff and the Popular Education Publishing Company, John M. Good, and John L. Zimmerman entered into the final agreement of the series, and the relevant parts of that agreement are those which follow, viz.:

"The parties of the second part further agree that they will continue to pay one-half of the salary ($1,000.00 per annum) to N. O. Wilhelm, or his successor, at Chautauqua, New York, as has heretofore been done by them, and that in return for the party of the first part paying the other one-half of the salary ($1,000.00 per annum) during the term of this instrument, said Wilhelm, or his successor, is to be allowed to conduct the extension department of said first party during that time.

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

"It is mutually agreed by and between the parties hereto that the original lease of 1902, now operating between them, shall be in and continue in effect, except where it may be superseded for the time being by this instrument, and in such cases this instrument during this time is to be substituted for the original lease during its term."

It is alleged by the plaintiff that the regular subscribers to the Chautauquan Magazine in the latter part of 1905 and the beginning of the year 1906 were about 8,000, some of which were received under

and by the name of the Chautauquan Press, and in great part commenced with the issue of September, 1905, and continued for one year thereafter, and that some of these subscriptions were received by the plaintiff and turned over to the defendants and the others were received by the defendants. It is further alleged that on or about the 20th of December, 1905, the defendants notified the plaintiff that they would not longer furnish nor issue the Chautauquan Magazine under and pursuant to the terms and provisions of their several agreements, but would decline to carry out the said agreements except to the extent of winding up the business, and that defendants did not either by themselves or by any other means or person, or corporation, publish or continue to publish the Chautauquan Magazine after the issue in January, 1906, but refused and declined to do so.

It is unnecessary to state in more detail the allegations upon which the plaintiff in its petition based its right to recover, because the defendants admit practically all of those allegations and the court's judgment for the full amount claimed was not excepted to, nor is any complaint now made of it.

The defendants in their answer allege that by virtue of the provisions of the four contracts referred to they succeeded to all the rights of the Floral Publishing Company therein, and that immediately following the issue of the Chautauquan Magazine for January, 1906, the average monthly circulation of said magazine and its accompanying publications secured by the defendants or any of them or by plaintiff for the preceding year then next was 8,000.

They further claim that under the provisions of article 12 all of the leased property, including the magazine and other publications and said monthly circulation, reverted to the plaintiff as of January 1, 1906, that plaintiff took possession thereof, and that ever since that time, plaintiff has claimed and exercised and continues to claim and exercise full and exclusive ownership thereof, and is and has been ever since in full and complete enjoyment of same. Defendants also assert and claim that by reason of these facts and under the stipulations of article 12 referred to plaintiff became indebted to the defendants in the sum of $20,000 by reason of the reverter to it of the said property, and accordingly they plead this indebtedness as a counterclaim against plaintiff and demand judgment therefor.

Pursuant to sections 649 and 700 of the Revised Statutes the parties filed a stipulation in writing agreeing to submit the case to the judgment of the court without a jury—a jury being expressly waived. The District Court (which, by operation of law, had succeeded to the jurisdiction of the Circuit Court), by its judgment allowed the plaintiff's claim in full with interest up to the date of judgment, amounting to $17,668.82. It allowed the defendants upon their counterclaim the sum of $14,252 with interest to the date of the judgment, the amount being $21,073.95, with the result that it rendered judgment in favor of the defendants for the difference between the two amounts, namely, $3,405.13, with interest thereon from the date of the judgment and costs.

While, as we have seen, the defendants do not complain of the court's

judgment upon the plaintiff's cause of action, the plaintiff took exceptions to the allowance of defendants' counterclaim and tendered its bill of exceptions, in which was also embraced the evidence heard and various exceptions to the court's rulings thereon during the trial. This bill of exceptions was allowed by the court, and the plaintiff brought the case here by writ of error.

1. Before the hearing on the merits, the defendants moved the court to strike out the bill of exceptions, and moved also to strike out certain separate parts thereof. The latter motion, if sustained, would have emasculated the bill to an extent equivalent to striking out the entire bill. Both motions were argued and considered, and we have concluded that they should be overruled, though they have become so far immaterial as to require no particular statement of our reasons for overruling them, except that they are similar to those indicated in the opinions of this court in Camden Iron Works v. Sater, 223 Fed. 611, 139 C. C. A. 157, and Edwards v. La Dow, 230 Fed. 378, 144 C. C. A. 520, decided March 7, 1916.

[1] 2. The court below made very full findings of fact, and with great pains and elaboration stated in its opinion the grounds of its judgment thereon. In its assignment of errors the plaintiff specifies 26 rulings of the court which it claims were erroneous. We must first examine the assignments of error in the light of sections 649 and 700 of the Revised Statutes and a great number of cases which have construed them. The Supreme Court said in Dooley v. Pease, 180 U. S. 126, 131, 132, 21 Sup. Ct. 329, 331 (45 L. Ed. 457) that:

"Where a case is tried by the court, a jury having been waived, its findings upon questions of fact are conclusive in the courts of review, it matters not how convincing the argument that upon the evidence the findings should have been different. Stanley v. Supervisors, 121 U. S. 547 [7 Sup. Ct. 1234, 30 L. Ed. 1000].

"Errors alleged in the findings of the court are not subject to revision by the Circuit Court of Appeals, or by this court, if there was any evidence upon which such findings could be made. Hathaway v. National Bank, 134 U. S. 498 [10 Sup. Ct. 608, 33 L. Ed. 1004]; St. Louis v. Rutz, 138 U. S. 241 [11 Sup. Ct. 337, 34 L. Ed. 941]; Runkle v. Burnham, 153 U. S. 225 [14 Sup. Ct. 837, 38 L. Ed. 694]."

This language refers specifically to section 649, but many cases hold that under section 700 only questions of law decided by the court during the progress of the trial and duly excepted to, and the general question whether the facts found are sufficient to support the judgment, can be reviewed by an appellate court. United States v. U. S. Fidelity Co., 236 U. S. 527, 35 Sup. Ct. 298, 59 L. Ed. 696; Nashville Interurban Ry. v. Barnum, 212 Fed. 634, 129 C. C. A. 170.

The court under neither section will consider whether the testimony supports the finding of fact, for, said the Supreme Court in Lehnen v. Dickson, 148 U. S. 72,[1] "the verdict of a jury settles all questions of fact," and section 649 expressly provides that the findings of the court "shall have the same effect as the verdict of a jury."

We must apply these rules to the first 8 of plaintiff's assignments of errors, and as each of them only questions the accuracy of some finding of fact they need be given no further attention.

[1] 13 Sup. Ct. 482, 37 L. Ed. 373.

3. The ninth assignment is directed against the thirteenth of the court's findings, and claims that there was no testimony to support the finding. If we assume this to be true, the matter nevertheless has become immaterial for the reason that the judgment upon defendants' counterclaim was not to any extent founded upon the clause of the contract of October 15, 1904, respecting the "correspondence of records of the office as conducted by the defendants," but altogether upon the provisions of article 12 of the contract of April 24, 1902, presently to be examined.

4. Assignments of errors Nos. 14, 15, 16, and 21 all relate to the admission as testimony of certain statements made by John L. Zimmerman and John M. Good as witnesses for the defendants. These statements appear to have been mere explanations of the reasons actuating the defendants in abandoning the contract. While technically it possibly may have been erroneous to admit this testimony, no prejudice resulted to the plaintiff, because the matter became wholly immaterial when the court rendered judgment for plaintiff's entire claim for damages resulting from breaches of the contract, the reason for making which the witnesses undertook to explain. These assignments, therefore, have no force.

[2] 5. Assignments 24, 25, and 26 either fall under the objection that they question the accuracy of findings of fact or they are appropriate only to a motion for a new trial. The former phase has already been sufficiently treated, and a motion for a new trial being a matter of judicial discretion, the court's ruling thereon will not be reviewed. Big Brushy Coal & Coke Co. v. Williams, 176 Fed. 533, 99 C. C. A. 102.

[3] 6. While some of the other assignments of error are confused in statement and difficult to classify, they may all, we think, be broadly embraced in two general groups. And first those which question the admissibility of portions of the testimony of N. O. Wilhelm. This witness, under the contracts, was in the joint employment of the plaintiff and defendants in very responsible positions, and was well acquainted with the situation and condition of the business conducted.

As we have seen, the plaintiff, in its declaration, claimed damages for certain breaches of the contract between the parties. The court adjudged the plaintiff to be entitled to the full amount it had demanded. The defendants in their answer, made a counterclaim against the plaintiff for $20,000, under the provisions of article 12 of the original lease, and in substance alleged as the basis thereof that the leased property had, on January 1, 1906, reverted to the plaintiff, that the latter had taken possession of it and had ever afterwards used and possessed it, that at the time of the reverter the average circulation of the magazine for the 12 months preceding said date was not less than 8,000, and that under article 12 they were entitled to claim and did claim $2.50 upon each subscription. The plaintiff's reply made no issue upon defendant's allegations that plaintiff had in 1906 taken possession of the magazine and other leased property and resumed its use. On the contrary, it asserted that it had done so, and made issues only upon other questions, particularly as to the number of subscribers secured by defendants in 1905.

The testimony of Wilhelm was taken upon the issues made upon the counterclaim. Among other things he testified that he was connected with plaintiff from October 1, 1902, to October 1, 1906, as director of extension, and was also at the head of the subscription department of the Popular Education Publishing Company, that in a general way he saw and "kept tab" on the subscription lists of defendants in the midst of his other duties, but did not have actual charge of them; that the circulation of the magazine was around 8,000, more or less, each month; that he had seen the mailing lists for October, November, and December, 1905; that he had gone over them and counted a few of the columns, the average number of names in each being 45; that on the day he testified, and while he was testifying, he had made calculations which indicated the average circulation to be 8,000, more or less, but he did not make further actual count, nor claim mathematical accuracy for his figures. This estimate of 8,000 agreed with that stated alike by the plaintiff and defendants in their pleadings. However, at about this stage in the trial it was expressly agreed between counsel and entered upon the record that the average monthly circulation of the Chautauquan Magazine for the year 1905 was 7,126, which relieved that issue from further uncertainty.

The testimony had otherwise shown that during the preceding years the letters, papers, subscription lists and documents respecting circulation and pertaining to the business generally, and which were all then in plaintiff's hands, had accumulated to an extent which would make it practically impossible, within any reasonable time, to so separate them as to enable any one to tell precisely what proportion of the subscriptions to the magazine made in 1905 had been secured by the defendant and what proportion by the plaintiff. Under all the circumstances, and although plaintiff produced or offered to produce the entire mass of papers, the court permitted Wilhelm to make an estimate of the proportion which had been obtained in that year by defendants' organizers throughout the United States and what proportion by the plaintiff. He gave his best recollection of the facts and numbers and made an estimate, the precise accuracy of which he could not attest, but it was his best recollection that four-fifths of the subscriptions were obtained by the defendants and one-fifth by the plaintiff. Allowing the witness thus to testify involved a decision by the court that Wilhelm was competent and qualified to make an estimate which was intelligent and not mere guesswork. Under these circumstances we think the trial judge who heard all the other testimony and was in position to judge of the inherent probabilities of the situation might properly receive the estimate of Wilhelm and give to it in connection with the other testimony such weight as he thought proper.

There is some analogy between this situation and that upon which the Supreme Court, in Inland, etc., Co. v. Tolson, 139 U. S. 559, 11 Sup. Ct. 656, 35 L. Ed. 270, said:

"Whether a witness is shown to be qualified to testify to any matter of opinion is always a preliminary question for the judge presiding at the trial, and his decision thereon is conclusive unless clearly erroneous as matter of law."

7. The remaining assignments present in various forms two questions: First, whether there was any competent testimony to support the court's several findings of fact in respect to the counterclaim; and, second, whether those facts were sufficient to support the judgment rendered thereon for the defendants. It would be tedious and unnecessary to go into details, but we have no doubt, after careful examination of the record, that there was competent testimony heard in support of each of the court's findings, and this being so, we are not permitted to inquire whether the facts were correctly found. Dooley v. Pease, 180 U. S. 131, 132, 21 Sup. Ct. 329, 45 L. Ed. 457; Runkel v. Burnham, 153 U. S. 225, 14 Sup. Ct. 837, 38 L. Ed. 694; United States v. U. S. Fidelity Co., 236 U. S. 527, 35 Sup. Ct. 298, 59 L. Ed. 696.

[4] Thus we come to the final question whether the facts found were sufficient to support the court's judgment on the counterclaim. The plaintiff insists, inasmuch as the defendants in December, 1905, pursuant to notice given by them, definitely declined to further perform the contract sued on, that they cannot recover on their counterclaim. To support this contention, it relies upon the general principle announced in many decided cases that:

"Where there is an entire executory contract and the plaintiff has performed a part of it, and without legal excuse and against the consent of the defendant, refuses to perform the rest, he cannot recover anything for the part performed."

Among the cases cited in support of this general proposition are Niblett v. Herring, 49 N. C. 262, Brown v. Kimball, 12 Vt. 617, Malbon v. Birney, 11 Wis. 107, Scheible v. Kline, 89 Mich. 376, 50 N. W. 857, Hartman v. Meighan, 171 Pa. 46, 33 Atl. 123, and Van Clief v. Van Vechten, 130 N. Y. 571, 29 N. E. 1017.

We are not convinced, however, that these authorities or the general principle some of them maintain should be applied here. On the contrary, we adhere to the views expressed for this court by Judge (later Mr. Justice) Lurton, in Michigan Yacht & Power Co. v. Busch, 143 Fed. 929, 75 C. C. A. 109, where it was said that:

"It is now well established that a plaintiff may recover to the extent that he has benefited the defendant by part performance of a contract which the plaintiff himself has failed to carry out; his recovery being subject to recoupment by the damages sustained by the defendant."

While this case is so far unusual as to stand apart, the general principle last stated seems to have some application. Here, after the breach of the contract by defendants, the plaintiff took possession of all of the property including subscriptions, and thereafter did the work which the defendants had refused to do. This, of course, terminated the lease between the parties as of January 1, 1906. For the breaches of the contract involved in defendants' refusal further to carry into effect its terms the plaintiff sued, and has been adjudged the full amount of damages it had thereby sustained. The contract sued on is plainly and by its express terms a lease. This characterization of the agreement was carried through all of the contracts. One of the inherent terms of a contract of lease is that at its termination the prop-

erty leased returns or reverts to the lessee. No reason is suggested why this inevitable result should not follow the termination of this lease on January 1, 1906. It was always within the contemplation of the parties that there should be at some time a termination of the lease and a return of the property. Furthermore, it was intended, not only that the property on hand in 1902 should be returned, but also that certain property created during the last year of the lease in the way of subscriptions secured by defendants should be turned over to plaintiff and paid for by it, and the agreement contained stipulations providing for this. The damages resulting from the premature and wrongful termination of the lease have been assessed against the defendants, but this does not interfere with article 12 of the contract, which now becomes most important, for it explicitly provides that in case the rights and property leased hereunder shall revert to the owner, the latter shall pay the lessees $25,000 for each 10,000 average monthly subscriptions secured by the defendants for the preceding 12 months, and proportionately for a greater or a less number. This, of course, is $2.50 for each subscription.

If we assume that this proved to be an unwise and unfortunate stipulation, nevertheless it was, in the plainest terms, agreed to by parties competent to contract, and we perceive no reason to doubt its validity. The parties had a right to make the stipulation and each is bound by its terms. The subscriptions for the previous year were regarded as valuable and their value was agreed upon and fixed. Four-fifths of the 7,126 subscriptions were obtained in 1905 by the defendants. Construing the contract the court below allowed defendants $2.50 for each of four-fifths of the 7,126 subscriptions, and in this, we think, there was no error, inasmuch as the court only carried into effect the agreement of the parties after having imposed upon the lessees a judgment for the full amount of damages claimed by the plaintiff as the result of defendants' breaches of the contract, thereby making full reparation for that wrong.

Upon these grounds we are constrained to conclude that the judgment of the court below was correct, and it is accordingly affirmed.

⊕═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes