## UNITED STATES v. PENNSYLVANIA & LAKE ERIE DOCK CO.

### (Circuit Court of Appeals, Sixth Circuit.  May 7, 1921.)

### No. 3466.

1. **Appeal and error ⊜⟹1010(1)—Special findings, sustained by substantial evidence, are conclusive.**

    Special findings of fact by the court, under Rev. St. § 700 (Comp. St. § 1668), when sustained by substantial evidence, are conclusive in error proceedings.

2. **Ejectment ⊜⟹9(3)—Plaintiff must recover on strength of its own title.**

    If plaintiff, in action to recover possession of real estate, fails to establish right and title in itself, it must fail, regardless of whether defendant has any title or right to possession.

3. **Ejectment ⊜⟹95(1)—Evidence held to sustain judgment for defendant in action by government to recover possession of harbor property.**

    In action by the United States to recover possession of a strip of land used as a pier, evidence *held* to support findings for defendant.

4. **Appeal and error ⊜⟹850(2)—Additional facts not found cannot be considered.**

    In reviewing findings of fact by the court under Rev. St. § 700 (Comp. St. § 1668), additional facts not found by the trial court cannot be considered.

5. **Appeal and error ⊜⟹850(2)—Mixed finding of fact and law conclusive as finding of fact.**

    A finding, in action by the government to recover possession of land used as a pier, that the government had abandoned the pier, is a mixed finding of fact and law, that is binding upon review as a finding of fact only, where there is evidence on which the facts involved therein could be made, if such facts sustain the legal conclusion which is necessarily a part of the finding.

6. **United States ⊜⟹58—May abandon pier in harbor without act of Congress.**

    Where the government has appropriated a strip of land in a harbor, and taken possession thereof and erected a pier thereon in aid of navigation, the government's failure and neglect to keep the pier in repair is evidence that will sustain a finding that the government had, in a legal sense, abandoned the property; for the rule, under Const. art. 4, § 3, that the government cannot abandon its property without an act of Congress to that effect, applies to land the title to which has been acquired or originally vested in the government, but not to property in which the government by virtue of its dominant right appropriates a mere easement for purposes more or less temporary in nature.

7. **Eminent domain ⊜⟹2(10)—Taking submerged land for government pier not an exercise of power of eminent domain.**

    The appropriation of a submerged strip of land on which to construct a government pier *held* not a taking of private property for public use for

---

permanent purposes, but rather the mere lawful exercise of a governmental power for the common good.

8. **Navigable waters** ⊙⟶14(1)—**Government may change harbor lines.**

The right of the government to establish harbor lines is not exhausted by one exercise of the power, but it may change these lines as often as it deems necessary, in order to protect navigation from obstruction.

9. **United States** ⊙⟶58—**Evidence showing abandonment by government of pier strip in harbor.**

In action by the government to recover possession of a strip of submerged land in a harbor, used for pier purposes, evidence that defendant dock company, before commencing the construction of a concrete dock on the strip, made application to the War Department for permission to encroach upon the harbor line at points indicated on a map accompanying the application, which showed the proposed construction, and that the government, although thereby fully informed of the proposed construction, made no objection, and made no claim to the property, but stood by while the defendant made large expenditures for the concrete dock, *held* material to the question of abandonment by the government of the strip, and, in connection with other evidence, to support finding of such abandonment.

In Error to the District Court of the United States for the Eastern Division of the Northern District of Ohio; D. C. Westenhaver, Judge.

Action by the United States against the Pennsylvania & Lake Erie Dock Company. Judgment for defendant, and the United States brings error. Affirmed.

H. L. Eastman, Asst. U. S. Atty., of Cleveland, Ohio (E. S. Wertz, U. S. Atty., of Cleveland, Ohio, on the brief), for plaintiff in error.

Clan Crawford, of Cleveland, Ohio (Squire, Sanders & Dempsey, of Cleveland, Ohio, on the brief), for defendant in error.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

DONAHUE, Circuit Judge. This proceeding in error is brought to reverse the judgment of the District Court, Northern District of Ohio, Eastern Division, in an action brought by the United States against the Pennsylvania & Lake Erie Dock Company under favor of section 11903, General Code of Ohio, to recover possession of real estate situated in Fairport Harbor, Lake county, Ohio. The plaintiff avers in its petition that it has a legal estate in and is entitled to the immediate possession of a strip of submerged land 1,103 feet long and 15 feet wide, extending from the mouth of Grand river in Fairport Harbor, Lake county, Ohio, into Lake Erie.

The defendant in its answer admitted that it was in possession of the property described in the petition, and denied that the plaintiff has any legal estate therein, or that it is entitled to the possession thereof. Upon the trial of the cause the defendant disclaimed title, and denied that it was in possession of the portion of this strip of land sought to be recovered by the plaintiff in this action, lying north of a point 492.30 feet north of the north line of Second street in the village of Fairport. This controversy is therefore narrowed to the question of the title and right of possession of the United States to the southern end of this strip, 15 feet wide and 492.30 feet in length, ex-

⊙⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

tending from the north line of Second street, Fairport, to the north line of lot 5 of the lots platted on the new-made land lying north of Second street.

It is contended on the part of the defendant in error that this proceeding in error presents no question for the consideration of this court, for the reason that by stipulation of parties this cause was submitted to the court without the intervention of a jury, and that the court made no special findings of fact within the meaning of sections 649–700, R. S. It is conceded by the plaintiff in error that such special findings of fact are necessary to a review of the questions here presented, but it insists that such findings appear in the memorandum opinion of the trial court. The court in its opinion did make some findings of ultimate facts, but it is not clear that such findings were intended as special findings for the purposes of this review, or that the findings made are such special findings as are contemplated by the sections above cited. The court, however, does find as ultimate facts:

First. That between 1827 and 1838 the plaintiff constructed a pier in Fairport harbor, beginning at the north line of Second street in the village of Fairport, Lake county, Ohio, and extending for a distance of 133 feet in a slightly northwesterly direction, thence due north to its northern terminus in Lake Erie; that the southern end for a distance of 254 feet was of pile construction, 9 feet in width, and the residue of crib construction, 14 feet in width.

Second. That after 1838 the United States government did not expend any money upon the maintenance and repair of the south portion of this pier now in controversy, but that in 1844 and subsequent to that time the government did expend considerable sums of money in repairing the northern portion of the pier, to which the defendant disclaimed title and possession.

Third. That subsequent to 1838, and about 1844, the government abandoned the south 492.30-foot portion of this pier.

Fourth. That the license issued June 22, 1889, by the United States government to the defendant's predecessor in title, to use this pier, did not cover the south 492.30 feet, which is here in controversy.

Fifth. That the original wooden pier 9 feet in width, constructed by the plaintiff prior to 1839, is no longer in existence, and that it did not occupy the same position as defendant's present concrete construction.

There are other findings of fact of minor importance; but all of these other findings, to some of which reference will be made later in this opinion, are entirely consistent with the ultimate facts found by the court as above stated.

[1] It is provided by section 649, R. S. (Comp. St. § 1587), that where a jury is waived the findings of fact by the court shall have the same effect as the verdict of a jury. Section 700, R. S. (Comp. St. § 1668), provides, among other things, that "when the finding is special, the review may extend to the determination of the sufficiency of the facts found to support the judgment." Section 1011, R. S. (Comp. St. § 1672), provides that "there shall be no reversal in the Supreme Court or in a Circuit Court * * * for any error of fact."

It necessarily follows that, unless these findings of fact are findings within the meaning of section 700, R. S., the judgment of the trial court must be affirmed. On the other hand, if we accept these findings as such special findings required by section 700, R. S., then, if they are sustained by any substantial evidence, they are conclusive upon this court, regardless of how convincing the argument may be that upon the evidence the finding should have been different. United States v. Fidelity Co., 236 U. S. 512, 35 Sup. Ct. 298, 59 L. Ed. 696; Dooley v. Pease, 180 U. S. 126, 131, 132, 21 Sup. Ct. 329, 45 L. Ed. 457; Stanley v. Supervisors, 121 U. S. 547, 7 Sup. Ct. 1234, 30 L. Ed. 1000; Rutan, Collector, v. Johnson, 231 Fed. 369, 145 C. C. A. 363; Chautauqua Institution v. Zimmerman, 233 Fed. 371–375, 147 C. C. A. 307; Mayes, Collector, v. Jones & Co. (C. C. A.) 270 Fed. 121.

If it were conceded that these findings of fact by the trial court as they appear in the memorandum opinion are such special findings as are required by section 700, R. S., then this record presents but two questions: First. Are the facts found by the court sufficient to support this judgment? Second. Is there any evidence upon which such findings could be made?

[2] Upon the question of the sufficiency of the findings to support the judgment there can be little or no controversy. The third and fifth findings, not only sustain the judgment as given, but imperatively demand that such a judgment be entered. If the plaintiff has failed to establish title and the right to possession in itself, it must fail in this action, regardless of whether the defendant has any title or right to possession, for the defendant cannot be ousted of possession by one having no superior right or property interest therein.

[3] Upon the second question, as to whether there is any evidence upon which such findings could be made, the answer must also be in the affirmative. Upon the first finding, as to the construction of the 9-foot wooden pier some time between 1827 and 1838, there is no controversy. It does not affirmatively appear, however, that Congress made any specific appropriation of this property for pier purposes. On the contrary, on March 3, 1825, it appropriated $1,000 for completing the pier at the mouth of Grand river. No prior legislation upon this subject was offered in evidence, except the Act of May 15, 1820, appropriating $6,600 for a lighthouse to be built at the mouth of Grand river in the state of Ohio. Other evidence, however, tends to establish that this lighthouse was not constructed upon this pier, so that evidently this act of Congress had no application to the issues here involved. The court divided the evidence introduced on the trial into three periods. From 1825 to 1844, from 1844 to 1888, and from 1888 to 1917.

[4] Counsel for the defendant in error, in the discussion in their brief of the evidence covering the first period, calls the attention of this court "to some additional facts that we believe have a bearing upon a correct determination of this case." In view of the authorities above cited, it would seem unnecessary to say that this court cannot consider "additional facts not found by the court," but must limit

its consideration of this case solely to the special findings of fact made by the trial court. Notwithstanding the claim of the defendant in error that the evidence introduced covering this first period does not show a construction of a government pier as found by the court, but rather merely an appropriation of money to complete a pier which may have been commenced or partly constructed by adjacent landowners, we are of the opinion that this evidence taken in connection with the report, plan, and estimate submitted in 1826 by Capt. T. W. Maurice relative to the improvement of the mouth of Grand river, sufficiently sustains this finding of the trial court.

[5] The major contention of the plaintiff in error is that the third finding of the court, that the government abandoned the south 492.30-foot portion of this pier, is not sustained by the evidence. This finding is a mixed finding of fact and law, that is equally binding upon this court as a finding of fact only where there is evidence upon which the facts involved in such finding could be made, if such facts sustain the legal conclusion, necessarily a part of this finding. Rutan, Collector, v. Johnson et al., supra.

[6] It is insisted by the plaintiff in error that shortly subsequent to the Act of March 3, 1825, appropriating $1,000 for completing the pier at the mouth of Grand river, the United States government appropriated this strip of submerged land and constructed a pier thereon. This claim is sustained by the first finding of the trial court above stated. It is further contended by the plaintiff in error that, having once appropriated this strip of ground, taken possession thereof, and erected a pier thereon in aid of navigation, the government cannot abandon its property without an act of Congress to that effect, and that for this reason evidence that the United States failed and neglected to keep this pier in repair is not evidence that will sustain a finding that the government had, in any legal sense, abandoned its property. This contention is based upon section 3 of article 4 of the Constitution, the decision of the Supreme Court in the case of Light v. United States, 220 U. S. 523–536, 31 Sup. Ct. 485, 55 L. Ed. 570, and other cases therein cited.

[7] This undoubtedly is the law in so far as it applied to land the title to which has been acquired or originally vested in the government, but it does not apply to property in which the government by virtue of its dominant right appropriates a mere easement for purposes more or less temporary in their nature. In this particular case the appropriation of this submerged strip of land upon which to construct a government pier was not a taking of private property for public use for permanent purposes, but rather the mere lawful exercise of a governmental power for the common good. Lumber Co. v. Garrison, 237 U. S. 251, 35 Sup. Ct. 551, 59 L. Ed. 939; Railroad Co. v. Chicago, 201 U. S. 506, 26 Sup. Ct. 518, 50 L. Ed. 845. There is a substantial difference between the temporary exercise of a dominant governmental power over property and the permanent appropriation of private property for public use. In the latter case the title to the property passes to the government. In the former case it acquires absolutely no estate in the property, further than to subordinate it

to the purpose for which that power is exercised so long only as it may appear to be necessary to exercise such power for the public good,

[8] This is particularly true in reference to the establishment of harbor lines. The right of the government is not exhausted by one exercise of this power, but it may change these lines just as often as it may deem necessary, in order to protect navigation from obstruction. Philadelphia Co. v. Stimson, 223 U. S. 605–638, 32 Sup. Ct. 340, 56 L. Ed. 570.

In this case the power of the government to construct this pier in aid of navigation did not require that it should forever maintain that pier in that particular place. It could change it to any other location, whenever it determined that such other location would be more advantageous for navigation purposes, and undoubtedly it could abandon it altogether when the need for its maintenance no longer existed. The purpose of these piers was to narrow the channel, so that the velocity of the current would be increased sufficient to carry the sand out of the river mouth into the deeper waters of the lake. Capt. Maurice recommended that the channel should be narrowed to 150 feet between the piers. This recommendation was not approved, and the piers were constructed 200 feet apart. If experience had shown that Capt. Maurice was right about it, then the government, in order to accomplish the purpose for which it had exercised this dominant power in aid of navigation, would have been compelled to change the location of one or both of these piers, and if it had done this it would hardly be claimed that it had not abandoned the original location. It likewise follows that if, by reason of the existence of this pier, or for any other reasons, the accretions to the adjacent land extended the river bank out into the lake along all or part of this pier, this new-made land might be just as effectual to accomplish the narrowing of the channel of the mouth of the river as the pier itself, and the reasons for the exercise of this dominant power, by the continued maintenance of a pier, might thereby wholly disappear. In the years following the construction of this pier, the shore line to the east of it was extended by accretions to and beyond a point 492.30 feet north of the north line of Second street. In 1844 the plaintiff's predecessors in title were adjudged to be the owners of that land, and immediately caused the same to be platted into five lots. These lots would in and of themselves form a river bank, answering the same purpose for which the pier was originally constructed. Under these changed conditions, it would seem that there would be no more purpose in the government maintaining this pier along this newly-made river bank than there would have been purpose in projecting it south of the north line of Second street.

While the report of the engineers in 1844 shows that this pier was practically destroyed and useless throughout its entire length, the money appropriated by Congress was applied solely to the construction of a new pier from the north boundary of lot 5 to its original terminus in Lake Erie. For many years it was generally understood in that community that the government pier was that portion of the original construction north of the portion now in dispute, which north

part was reconstructed, maintained, and kept in repair by the government. This situation was so universally understood and accepted that the northwest corner of lot No. 5 of the newly platted lots was designated in deeds of conveyance of the title to this lot as "the south end of the government pier." Nor was this understanding as to the southern terminus of the government pier confined merely to the residents of that locality.

In a report forwarded to Col. Jared A. Smith, February 21, 1894, by F. S. Burrows, Assistant Engineer, the east pier is described as being 1,760 feet in length. This corresponds with the distances on the map accompanying this report, which map shows the inner end of the east pier about 500 feet north of the north line of Second street. The report also states that—

"About 1,100 feet from the outer end of the pier, the Dock Company has constructed a bulkhead of timbers and piles running normal to the pier for about 200 feet, then turning and running parallel to the pier until it intersects the shore line. The area included between the bulkhead and pier has been filled, and track and platform laid, so that it can be utilized for handling and storing only. The part of this pier inside the bulkhead would seem to be no longer necessary as a contraction work, but might be useful as an ore dock."

The map shows this north end of the bulkhead to be 614 feet north of the point marked as "Inner End of U. S. Pier." This agrees with the statement in the report as to the length of that portion of the pier. Another map (Plaintiff's Exhibit 44) made by government engineers in 1903, following a survey made under authority of an act of Congress directing a survey of the north and northwestern lakes, shows a "Pier Head Front Light" at the north extremity of this pier, and a "Pier Head Rear Light" at the end of the ore dock, or substantially 500 feet north of the north line of Second street.

It is contended upon the part of the plaintiff in error that the fact that the defendant's predecessor in title in 1888 applied for and accepted a license for this government pier, for which it agreed to pay an annual rental, and for which it did pay one year's rental, completely estops this defendant from denying the title of the government to this strip of land. The trial court found that this license did not cover that portion of the pier or dock now in dispute, but, on the contrary, only the pier lying north of 492.30 feet north of the north line of Second street. This finding of the trial court is based upon the evidence that the Act of Congress of August 11, 1888, referred only to the east government pier "lying north of the present low-water mark." This act was followed by the joint resolution of October 1, 1888, in which resolution it is stated that—

"Present low-water mark in the River and Harbor Bill of August 11, 1888, in the paragraph referring to Fairport Harbor, Ohio, is intended to mean the inner shore line represented on the map in report of Chief of Engineers of 1881."

While no shore line on this map is designated as "inner shore line," it is nevertheless, contended by counsel for plaintiff that the inner shore line means the shore line of 1826 shown on this map. It is im-

possible to determine with absolute certainty from the map itself just which is the inner shore line within the meaning of this joint resolution. The south end of the government pier is located upon this map a little south of the shore line of 1880, and a little north of the shore line of 1839–44. The south end of the pier as here located is considerably north of the strip of land now in dispute. These shore lines are shown to the right of the pier and in connection with it, covering the period from 1839 to 1880. The shore line of 1826 is shown on the map at an entirely different place and a little south of the center of Second street, by a short line running from the water's edge to the street intersection. It is wholly separate and apart from the shore lines shown in connection with the government pier. In view of the fact that this resolution relates to this government pier, and that reference is made to this particular map for the purpose of making more certain the shore line intended by the Act of August 11, 1888, certainly "the inner shore line," within the meaning and intent of that resolution, must be one of the shore lines shown upon that map that has some relation or connection with the government pier shown on the same map; that is to say, if Congress accepted this map as correctly representing the location of the government pier, and the map itself shows that the south end of this pier is located considerably more than 500 feet north of Second street, where the shore line of 1826 is designated on the map, it would seem that Congress could not have intended by the phrase "inner shore line" to mean the shore line of 1826, but rather one of the shore lines designated on the map in connection with the pier itself.

Of these shore lines that are shown to the right of the pier and in connection with it, the shore line of 1880 is the inner shore line; that is, the one nearest to the mainland, that actually connects with the pier, although the pier extends a little distance south thereof. The actual inner shore line that is shown at this place on the map is the shore line of 1844; but the south end of the pier does not extend quite so far south, so that it is doubtful if Congress could have intended by this resolution to have meant even the shore line of 1844. On the contrary, the presumption would naturally obtain that it meant the inner shore line sufficiently far north to come in contact with the south end of the pier as shown on the map, and that would be the shore line of 1880. However that may be, the application for the license filed with the Secretary of War by plaintiff's predecessor in title refers to the Act of Congress of August 11, 1888. The license granted in pursuance of this request also refers to this act, but nothing whatever is said in reference to the joint resolution of October 11, 1888, either in this application or the license that was granted in pursuance thereof, to use this government pier north of the "present low-water mark." For many years prior to the time this license was granted, the defendant's predecessor in title had been, and then was, using the docks along its water front, and immediately after obtaining the licenses it took possession of 665 feet of the pier lying directly north of these docks, and extended its tracks and hoisting machinery over that portion of the pier. After the failure and refusal of the licensee

to pay the second year's rental, Maj. Overman, then in charge of the Fairport Harbor, undertook to retake possession of this pier, and to that end constructed a foundation for a range light immediately north of the north property line of lot 5, or 492.30 feet north of Second street. This fact is also appropriated by the trial court as evidence tending to establish that the parties to this license contract fully understood that the south end of the government pier was at the point designated on this map of 1881, "where it had frequently been designated on older maps and documents."

The owners of this new-made land, immediately after their title had been settled by the Supreme Court of Ohio, constructed numerous warehouses thereon, and built and maintained docks along the entire water front, using for this purpose whatever piling still remained there, although, as the trial court found, the evidence does not clearly establish whether these pilings that were used in the construction of the dock were part of the pilings that were used in the original pier constructed by the plaintiff, or of a later one constructed by abutting lot owners. This condition continued until the Civil War, when the business at this harbor was practically abandoned. In 1864 a government engineer reported that all the woodwork of the east pier above water was much decayed and required to be renewed. On the map accompanying this recommendation, he states in reference to the south end of this pier: "The old dock timbers being cut up for fuel, and warehouses along here not in use, going to decay, and no business done in them." In pursuance of this report, that portion of the government pier north of the property line of the five new lots was repaired.

From the evidence establishing these facts, and particularly the map accompanying the recommendation, and the written statement thereon, the trial court properly found that the government pier contemplated in this report, and which was restored and rebuilt in pursuance thereof, was north of the portion now in dispute. It would seem that, if this north portion was in such a dilapidated condition as to require substantially to be rebuilt within six years after the work of its construction was completed, the southern end of pile construction was in equally bad condition, and that it would also have been repaired, had the government concluded that it was necessary, in view of the changed condition, to maintain this pier along the water front of the new-made land. The conclusion would seem inevitable that it then and there abandoned that portion of the pier. Certainly the failure to show by the evidence that it had expended any money whatever upon that portion of the pier since that time, either in renewal or in repair, compels such a conclusion. On the other hand, the evidence is convincing that the adjacent proprietors built and maintained docks along this water front since shortly after 1844, and these docks have been entirely removed and replaced with others of different width, and evidently in a large part upon a different location. This entire dock is now in line with the government pier north thereof. This removal of the old piers and the construction of new ones were continued after the act of Congress of 1876, making it an offense for any person to injure or destroy a government pier, and the government has not attempted

any prosecutions whatever against the owners of this abutting property for a violation of this statute.

[9] In 1905 the defendant, before commencing the concrete construction, applied to the War Department for permission to encroach on the harbor line at points indicated on the map accompanying the application, showing the proposed construction. This permission was granted. Regardless of whether the change in harbor lines was to be north or south of Second street, the application and accompanying map fully informed the plaintiff of the purpose of the defendant to construct this concrete dock 15 feet wide upon this particular location. If the government then made any claim whatever to this property, it should then have asserted that claim, instead of delaying until after this defendant had expended large sums of money in the construction of this concrete dock; but it did nothing of the kind. On the contrary, it not merely passively, but by granting this permission for a change of harbor line, it actually, consented to the construction of this dock. It not only made no claims to this property at that time, but by its action induced the defendant to believe that it had no such claim, and that it had abandoned the exercise of its dominant power to construct and maintain a pier at this location. The War Department was, by the Act of June 13, 1902, clothed with full authority to determine whether it would or would not maintain a pier along this portion of the water front, and it would seem that by this act alone, if by no other, the government must be held to have abandoned this particular site, or at least to have estopped itself from now claiming that it had not done so. Walker v. U. S. (C. C.) 139 Fed. 409–412; Michigan v. Jackson, 69 Fed. 116–122, 16 C. C. A. 345.

The trial court did not predicate its finding that the plaintiff had abandoned this property merely upon evidence of nonuse for more than half a century, but rather upon positive acts of the government indicating an intention to abandon, coupled with its acquiescence in the actions of adjacent proprietors in taking possession, asserting ownership, exercising absolute control, and spending large sums of money in the rebuilding, maintenance, and repair of this pier, practically ever since their title to the new-made land was settled by the Supreme Court of Ohio in 1844.

While the court made no specific finding as to estoppel on the part of the government to reclaim this land, nevertheless the evidence tending to prove that its conduct had been such as to estop it from making such claim equally applies to the question of abandonment. In the case of United States v. Stinson, 197 U. S. 200–204, 25 Sup. Ct. 426, 49 L. Ed. 724, the Supreme Court held that, while laches or limitations do not of themselves constitute a distinct defense as against an action by the United States to assert a right in property, nevertheless it affirmed the judgment of the lower court in that case, which judgment was based upon the declaration that "the substantial consideration underlying the doctrine of estoppel applies to the government as well as to individuals." Applying this doctrine to the facts of this case, in connection with the presumption that the United States government intended to act fairly in its dealings with its citizens, the finding of the

trial court that the plaintiff had abandoned this part of the east pier and the location upon which it rested is sustained by competent evidence.

If, however, the evidence wholly failed to sustain the finding that the government had abandoned this portion of the pier as originally constructed by it, nevertheless the further finding of the trial court that the present concrete dock constructed by the defendant does not occupy the same location as the original government pier would necessarily defeat the plaintiff's action, for it claims this property solely and only by reason of the fact that this original pier was located upon the identical strip of land described in the petition. The burden was upon the plaintiff to prove this allegation by a preponderance of the evidence. Nor was it necessary for the court to find positively that this concrete pier occupies a different location. It would have been entirely sufficient for the court to have found that the plaintiff failed to establish this averment of the petition by a preponderance of the evidence.

The plaintiff in its petition avers that it has a legal estate and is entitled to the possession of a strip 15 feet wide and 1,103 feet long extending from the mouth of the Grand river in Fairport Harbor. By the disclaimer of the defendant, this inquiry is now limited to the south end of this strip 492.30 feet. The petition describes this strip as the identical location of the defendant's concrete dock running due north and south from Second street, 15 feet wide, and at least the entire length of 492.30 feet. In support of its claim the plaintiff has shown that prior to 1838 it constructed a pier in aid of navigation 9 feet in width for a distance of 254 feet north from Second street in the village of Fairport; that the southern 133 feet of this pier was constructed in a northwesterly direction, and from there on due north; that the northern end of this pier was of crib construction 14 feet in width. Certainly this evidence does not prove that plaintiff is the owner of the 15-foot strip upon which the plaintiff's concrete dock is now located, and which runs due north from Second street to its northern terminus. The fact that this dock runs due north from Second street establishes beyond question that it has departed from the location of the original 9-foot pier. Whether it covers any part of that pier is not shown by any evidence in this case. From an examination of the original map submitted by Capt. Maurice in 1827, it would seem that this concrete dock necessarily departs to a considerable extent from the course of the original 9-foot pier, and it is altogether possible that only the extreme southern portion thereof is covered in part, if at all, by the concrete dock. Nor does the evidence indicate where this concrete dock would again intercept the original 14-foot crib construction running due north from the north end of the 9-foot pier.

It is therefore apparent that this finding of the trial court that the pier constructed by the plaintiff prior to 1838 did not occupy the same position as defendant's present concrete construction is sustained by some evidence. Even if the court had made no such finding, beyond question a part of this concrete pier is not upon the location of the

original government pier, and the plaintiff has not attempted by any evidence to show just exactly where its original 9-foot pier and its original 14-foot pier were located with reference to this present structure, so that a court could, with any degree of certainty, determine that fact. For that reason, if no other, it failed to establish the averments of its petition by a preponderance of the evidence.

For the reasons above stated, the judgment of the District Court is affirmed.

⊗⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes