MIAMI BEACH JOCKEY CLUB, Inc., v. DERN, Secretary of War.

No. 6577.

United States Court of Appeals for the District of Columbia.

Argued March 5, 6, 1936.

Decided April 6, 1936.

S. Wallace Dempsey of Washington, D. C., for appellant.

Leslie C. Garnett, U. S. Atty., and H. L. Underwood, Asst. U. S. Atty., both of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, GRONER, and STEPHENS, Associate Justices.

GRONER, Associate Justice.

This is an appeal from a final decree of the Supreme Court of the District of Columbia dismissing a bill of complaint brought by appellant to obtain an injunction against appellee, the Secretary of War, restraining him from interfering with the filling in of submerged lands in Biscayne Bay, Fla. We gather from the record that the proposed fill, if completed, would embrace an area of approximately 200 acres. The bottom land for the proposed island was acquired by Le Gro Properties by purchase from the state of Florida. That purchaser in 1931 made application to the United States District Engineer at Jacksonville, Fla., for a permit authorizing it to bulkhead the area and to fill the enclosure by dredging or pumping the material from a certain specified portion of the bay. The District Engineer recommended to the Chief of Engineers of the Army that the permit be granted, and it issued on June 23, 1931. Le Gro Properties on June 26, 1931, transferred title to Municipal Land Company, which company on the same day conveyed the land to Miami Beach Jockey Club, Inc., appellant herein. The purpose of the latter was to erect upon the island, when constructed, a complete racing plant consisting of grandstand, clubhouse, stables, paddock, and race course. One month after the permit was issued, and before the bulkheading was begun, a protest was filed with the District Engineer by owners of property on the bay. A rehearing was ordered; voluminous evidence was taken; the District Engineer recommended revocation of the permit, and his recommendation was approved by the Chief of Engineers. The Secretary of War on October 8, 1931, revoked the permit.

The position taken by appellant on this appeal is that the site of the proposed island is not in the navigable waters of the United States, and that neither the United States nor the Secretary of War has any jurisdiction over them. Appellant also insists that the action of the Secretary has no relation to the control of navigation and is an arbitrary attempt to destroy the rights of appellant as the owner of the submerged or swamp lands constituting the site of the proposed island; and, finally, that the Secretary of War, having in the first instance exercised his judgment and discretion, and having determined that the proposed island would not destroy or seriously interfere with navigation, was thereafter without power to review the application or recall the permit.

The applicable statute is section 10 of the Act of March 3, 1899 (30 Stat. 1151, 33 U.S.C.A. § 403). It forbids the creation of any obstruction to the navigable capacity of any of the waters of the United States, except on plans recommended by the Chief of Engineers and authorized by the Secretary of War.

There are but three questions in the case: First, is Biscayne Bay a navigable waterway? And, if that be answered in the affirmative, second, is there authority and power in the Secretary of War, after a hearing and the granting of the permit, to revoke it? If that be answered in the affirmative, then, was his action

arbitrary? The first two questions, we think, must be answered, "Yes," and the last, "No."

The United States derives its power over the waterways of the nation from two separate constitutional grants—the one the power to regulate foreign and interstate commerce (article 1, § 8, cl. 3) the other the exclusive grant of admiralty and maritime jurisdiction (article 3, § 2, cl. 1). "They are entirely distinct things, having no necessary connection with one another, and are conferred in the Constitution by separate and distinct grants." The Genesee Chief v. Fitzhugh, 12 How. 443, 452, 13 L.Ed. 1058. When the question of jurisdiction in admiralty first came before the Supreme Court, the rule adopted was that which applied in England, in consequence of which it was decided in The Thomas Jefferson, 10 Wheat. 428, 6 L.Ed. 358, that the domain of admiralty was the ebb and flow of the tide. But subsequently, in The Genesee Chief v. Fitzhugh, supra, the Supreme Court repudiated the doctrine that jurisdiction extended no farther than the reach of the tides, and held that the correct test was whether the water was navigable in fact. On the other hand, under the commerce clause the standard was stated by the Supreme Court in The Daniel Ball, 10 Wall. 557, 563, 19 L.Ed. 999, to be navigability in fact plus susceptibility for use in commerce and navigation. There the proceeding was against a vessel for violation of the federal license laws. The vessel drew only two feet of water and was engaged in the navigation of a short river wholly within the state of Michigan and emptying into Lake Michigan. The court said: "Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water. And they constitute navigable waters of the United States within the meaning of the acts of Congress, in contradistinction from the navigable waters of the States, when they form in their ordinary condition by themselves, or by uniting with other waters, a continued highway over which commerce is or may be carried on with other States or foreign countries in the customary modes in which such commerce is conducted by water."

There has been much writing on the subject, both by the Supreme Court and by the inferior federal courts, since the decision in The Daniel Ball, but the standard announced in that case has been consistently adhered to—(see footnote [1])—except that in the case of Leovy v. United States, 177 U.S. 621, 20 S.Ct. 797, 44 L. Ed. 914, the Supreme Court, speaking to the proposition that navigable waterways are highways of commerce, said the term should be construed to mean commerce of a substantial and permanent character.

So, for example, in The Montello, 20 Wall. 430, 441, 22 L.Ed. 391, the question involved was the navigability of the Fox River in Wisconsin. The river was connected with Lake Michigan and also with the Mississippi and had been first used, it is said, by Marquette and Joliet in 1673, and thereafter an extensive fur traffic had been carried on over it by means of flatboats and horse-drawn scows. Rapids and falls made the river unavailable to steam vessels, and the government corrected this obstruction. In answer to the contention that the river was not then a public navigable water, because not navigable in its natural condition, the Supreme Court said: "If it be capable in its natural state of being used for purposes of commerce, no matter in what mode the commerce may be conducted, it is navigable in fact, and becomes in law a public river or highway."

The same rule under opposite conditions was stated in Economy Light & Power Co. v. United States, 256 U.S. 113, 41 S.Ct. 409, 65 L.Ed. 847. The Des Plaines River had been rendered nonnavigable by certain obstructions placed in it by permission of the government. It was insisted that this made it nonnavigable in law as it then was in fact. But the Supreme Court replied that if it was capable of improvement for navigation by removal of the obstructions, it was navigable in law.

Finally, in United States v. Holt State Bank, 270 U.S. 49, 46 S.Ct. 197, 199, 70 L.

---

[1] The Montello, 20 Wall. 430, 22 L.Ed. 391; Economy Light & Power Co. v. U. S., 256 U.S. 113, 41 S.Ct. 409, 65 L.Ed. 847; Oklahoma v. Texas, 258 U.S. 574, 42 S.Ct. 406, 66 L.Ed. 771; U. S. v. Holt State Bank, 270 U.S. 49, 46 S.Ct. 197, 70 L.Ed. 465.

Ed. 465, which was a suit in equity to quiet title to the bed of Mud Lake, a body of water connected by an outlet with the Red River, the Supreme Court, adopting the language we have quoted from The Daniel Ball Case, added this further definition: "Navigability does not depend on the particular mode in which such use is or may be had—whether by steamboats, sailing vessels or flatboats—nor on an absence of occasional difficulties in navigation, but on the fact, if it be a fact, that the stream in its natural and ordinary condition affords a channel for useful commerce."

It is obvious from what has been said that it would be a waste of time to review the many cases decided by the District Courts or Courts of Appeal. Each turns upon its particular facts, and the question always is whether, in the circumstances, the waterway, in its natural condition, is susceptible of use as a highway for interstate or foreign commerce. Here, as we have seen, the challenge is to the finding of the Chief of Engineers that Biscayne Bay is so used or is capable of being so used. That the bay, treated as a whole, is a navigable waterway is, of course, beyond any real contention, for admittedly part of it is the present deep water harbor for ocean-going vessels to and from Miami. The United States has improved the channel from the ocean to the inner harbor, and, so far as this lower part of the bay is concerned, it is as much a natural waterway subject to the jurisdiction of the federal government as Chesapeake Bay or Delaware Bay. But there are bridges across the bay from Miami to Miami Beach, and there is a causeway at Seventy-Ninth street near the southern end of the proposed island; and the part of the bay above the bridges varies in depth from two to six feet. But the upper and lower parts of the bay are connected by draws through the bridges and causeway, so that there is at all times physical access from the one to the other; and it would be altogether inadmissible to treat them as separate bodies of water.

In 1927 (44 Stat. 1010, 1012, § 1) Congress authorized a channel eight feet by one hundred feet through Biscayne Bay (that part of it in which the proposed construction lies) as a part of the "Intra-Coastal Waterway"; and in 1929 the United States acquired an existing canal, which was dredged and improved, and which runs within a few hundred feet of the proposed island. This canal is a part of what is popularly known as the inland waterways route from Delaware Bay to Miami, an interior water route for small vessels constructed by the United States at great cost to avoid the particularly dangerous passage around Hatteras; and this route is now used by nearly all small craft, and especially by small yachts and pleasure boats going from the north to the south. The lower court also found as a fact that it is used extensively in commerce. But appellant says that, granting this, the manner of its improvement makes the canal unavailable to the waters in question. For instance, appellant says that the government has thrown the material dredged from the bed of the canal over on one side so that in some places it extends above the surface of the water and obstructs access to the canal from the part of Biscayne Bay in which the island is proposed to be built. But we think this contention without force. A casual view of the government chart of Miami harbor shows that the fill made in deepening the canal does not prevent entrance to the canal channel at some other point in the bay farther south. In other words, access to the canal still exists. But even if it were otherwise, the result would not be changed, for the sand or mud bank thrown up to one side is obviously merely temporary, and is, of course, susceptible of removal to make an approach to the channel from any part of the bay whenever the necessity arises. The obstruction is, therefore, like that in the Des Plaines River, discussed in Economy Light & Power Co. v. United States, supra, viz., within the power of Congress to remove. And, as the Supreme Court said in that case, it is for Congress and not for the courts to declare that a waterway susceptible of being made the avenue of commerce has been abandoned.

In a report in 1923 the District Engineer at Jacksonville reported to the Chief of Engineers on the subject of the proposed intracoastal waterway that it was reasonable to expect that the value of exports from the territory tributary to the waterway would amount to thirty millions of dollars and that this traffic could move at considerable saving in transportation cost as compared to land rates. And the lower court found, as a matter of fact, that the bay is navigable and that traffic

has moved over it for many years. This traffic, the lower court said, consisted of minerals, oil, and fuel amounting in 1931 to 30,000 tons, which came in tankers from the Gulf Coast and was transferred to barges. In that year 1,620 motor vessels and 366 barges traversed the waterway northbound, and 1,620 motor vessels and 325 barges southbound. In 1932 the tonnage using the canal was almost twice as great as the year before. This tonnage consisted largely of fishing boats and yachts, of which there were approximately 350 of the latter. Of the fishing boats, the court said they catch the fish in the open sea and bring them through the canal to shore to be shipped to the northern market.

The bay north of the Miami Beach causeway and bridges is a large body of water running approximately fifteen miles due north, and is three or four miles wide, with an average depth of three to four feet, and, as we have already pointed out, is the terminus of a much used canal from north to south. Certainly this is enough to bring it within the designation of a navigable waterway of the United States. If, as we hold, it is subject to the powers of Congress, then the finding of the Chief of Engineers that the proposed island would interfere with the navigable capacity of the bay, is binding on us unless it clearly appears that the finding is arbitrary, and this we are unable to say. Frankness does require us to add that the reasons assigned by the Chief of Engineers for the revocation are in themselves far from convincing; but that is not enough, for here they must be considered as they are supplemented by the stipulated facts and findings below. And so considered, we are clearly unable to say that they reach that bad degree that may be characterized as either wanton or arbitrary. See Greenleaf-Johnson Lumber Co. v. Garrison, 237 U. S. 251, at page 268, 35 S.Ct. 551, 59 L.Ed. 939.

Nor are we any more impressed with appellant's contention that, when the Secretary in 1931 authorized the construction of the island, he exhausted his authority and could not thereafter revoke the permit. Precisely the contrary has been decided a number of times. Under the Act Sept. 19, 1890, 26 Stat. 426, and Act March 3, 1899, 30 Stat. 1121, Congress asserted its paramount control over all navigable waterways of the United States; and it has been decided time and again that the permit which may be granted under section 10 of the act of 1899 is a mere license, revocable whenever necessary in the interests of commerce and navigation. Precisely this was held in United States v. Chandler-Dunbar Water Co., 229 U.S. 53, at page 68, 33 S.Ct. 667, 57 L.Ed. 1063, for there, the court expressly said such permits are revocable at will. To the same effect is Sanitary District v. United States, 266 U. S. 405, 45 S.Ct. 176, 69 L.Ed. 352.

And in Philadelphia Co. v. Stimson, 223 U.S. 605, 32 S.Ct. 340, 351, 56 L.Ed. 570, the court said that the United States has a continuing right to change lines of navigability and to prevent and remove obstructions outside the changed lines. "It is for Congress to decide what shall or shall not be deemed in judgment of law an obstruction of navigation. Pennsylvania v. Wheeling & Belmont Bridge Company, 18 How. 421, 15 L.Ed. 435. And in its regulation of commerce it may establish harbor lines or limits beyond which deposits shall not be made or structures built in the navigable waters." And again: "It must be concluded, therefore, that it was competent for Congress to provide for the establishment of the harbor lines in question for the protection of the harbor of Pittsburgh. It acted within its constitutional power in authorizing the Secretary of War to fix the lines. Union Bridge Co. v. United States, supra [204 U.S. 364] pp. 385–388 [27 S.Ct. 367, 51 L.Ed. 523]; Monongahela Bridge v. United States, supra [216 U.S. 177] p. 192, 30 S.Ct. 356, 54 L.Ed. 435. That officer did not exhaust his authority in laying the lines first established in 1895, but was entitled to change them, as he did change them in 1907, in order more fully to preserve the river from obstruction."

The same rule was followed in Greenleaf-Johnson Lumber Co. v. Garrison, 237 U.S. 251, 35 S.Ct. 551, 59 L.Ed. 939. In that case the plaintiff was the owner of the upland bordering the Elizabeth River opposite the Norfolk Navy Yard. Under the Virginia law it owned the fee in the soil to the low water mark and had the right as a riparian proprietor to extend out its piers or wharves to the line of navigability. Long prior to the assertion by the United States of its paramount power over the waterway, the state of Virginia had established harbor lines or

lines of navigability in front of the property in question. The plaintiff, pursuant to permission from the state, extended its improvements to this line. Subsequently, and after the passage of the acts of 1890 and 1899, the Secretary of War adopted the existing state harbor lines as the lines out to which a riparian proprietor could lawfully extend an improvement in the river bed. The lumber company, therefore, was in possession of its wharves and improvements by virtue of permission under both state and federal law. But long after the adoption of the harbor lines by the Secretary of War it became necessary, in the opinion of that officer, to change them so that they would run several hundred feet nearer the shore line; and as a result of this change a large part of the improvements placed in the river by the lumber company was about to be destroyed. It brought suit against the Secretary, on the ground that his threatened action was a taking of property without just compensation. It claimed there, as is claimed here, that when the Secretary of War adopted the Virginia lines and authorized the riparian proprietor to extend out to them, he exhausted his authority thereafter to change them; that they became fixed and unalterable except upon the payment of compensation for the destruction of the property involved in the change. The Supreme Court rejected this view and specifically held that the exercise of the power at one time did not exhaust the right to revoke the former action and make new lines, and that the Secretary's action taken in that respect was the lawful exercise of a governmental power for the common good. See also Port of Seattle v. Oregon, etc., R. Co., 255 U.S. 56, 70, 41 S.Ct. 237, 65 L.Ed. 500, and United States v. Pennsylvania & Lake Erie Dock Co. (C.C.A.) 272 F. 839.

We therefore hold:

First, that Biscayne Bay is a public navigable waterway of the United States;

Second, that the revocation of the permit was within the power of the Secretary of War;

Third, that on the finding of facts below, the act of the Secretary in revoking the permit was neither arbitrary nor capricious.

Affirmed.