**UNITED STATES of America**

v.

**JOSEPH G. MORETTI, INC., Joseph G. Moretti, Jr.**

**Civ. No. 71-1176.**

United States District Court, S. D. Florida.

Sept. 2, 1971.

## FINDINGS OF FACT

This action was brought pursuant to Sections 403 and 406 of Title 33, United States Code, on application of the United States of America, Petitioner, for injunctive relief restraining the defendants, Joseph G. Moretti, Inc. and Joseph G. Moretti, Jr., from further conducting dredge and fill work in Florida Bay at Hammer Point, Key Largo, Florida, from selling or conveying real property at that location, and for further relief the Court might find appropriate. A hearing on the Government's motion for a preliminary injunction was held on July 30, 1971, where testimony was taken and the Court issued an order restraining the defendants from conducting any further dredge and fill work in Florida Bay at Hammer Point and from selling and conveying any land filled in at that location below the mean high water mark as it formerly existed.

Beginning on August 18 and ending August 20, 1971, a hearing as to whether the preliminary injunction entered on July 30, 1971 should become permanent and whether the United States was entitled to further relief was held. At that hearing, testimony was taken from the following witnesses: Mr. James T. Glass, Professional Engineer; Dr. Frederick Bond, a resident of Key Largo; Mr. A. L. McKnight, former Chief of Operations, United States Army Corps of Engineers, Jacksonville, Florida; Mr. Lee Purkerson, Biologist, United States Environmental Protection Agency; Mr. Joseph Carroll, United States Department of Interior; Mr. Alexander Sprunt, Audubon Society, Tavanier, Florida; Mr. Lynn Peyton, State of Florida Department of Air and Water and Pollution Control; Mr. Gilbert Bird, United States Department of Interior. Also, numerous photographs were exhibited, and documents, together with several of these photographs were introduced into evidence.

The defendant, Joseph G. Moretti, Inc., is a construction company which

Robert W. Rust, U. S. Atty., by Kenneth G. Oertel, Asst. U. S. Atty., Miami, Fla., for plaintiff.

Terry, Petersen & McGowan, Miami, Fla., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MEHRTENS, District Judge.

This cause having come before this Honorable Court on the motion of the Petition, United States Attorney, for the United States of America, and after considering of pleadings in this matter, evidence presented at a hearing before this Court on July 30, 1971 where testimony was taken and a preliminary injunction entered against the defendants, Joseph G. Moretti, Inc. and Joseph G. Moretti, Jr., and at a further hearing held between August 18 and August 20, 1971 the purpose of which was to decide whether the preliminary injunction entered on July 30, 1971 was to become permanent, and being otherwise fully advised in the premises, the Court makes the following Findings of Fact and Conclusions of Law:

owns a tract of land located at Hammer Point, Key Largo, Florida, which it has developed into a trailer park. This development has involved digging of canals in Florida Bay, filling in parts of the upland and bay portions of this property, the placing of large rocks or "riprap" to create a bulkhead at the bayfront edges of the property and canals. During this construction work, various pieces of heavy equipment, including draglines and bulldozers were employed, together with the use of dynamite and other equipment normally associated with the removal and placement of large quantities of earth and rock fill. The defendant, Joseph G. Moretti, Jr., is the vice-president of Joseph G. Moretti, Inc., and the individual of that corporation who has been and is presently responsible for the Moretti Company's activities at their Hammer Point development in Key Largo.

At the time the Moretti Company began construction work at their Hammer Point, Florida Bay, Key Largo site, Florida Bay was and continues to exist as a navigable water of the United States. Florida Bay connects directly to the Gulf of Mexico and also at various points with the Atlantic Ocean.

Late in December of 1970, the United States Army Corps of Engineers at Jacksonville, Florida, received information of the Moretti Company's development and work which included dredging canals and filling in certain bottom lands and on December 30, 1971, the Army Engineers at Jacksonville, by telegraph, advised the Joseph G. Moretti, Inc. they had learned of the dredge and fill work being conducted at Florida Bay and that no record of a Department of the Army permit for such project was found to have been issued. The Army Corps of Engineers advised Moretti that such operations were unlawful in the absence of a permit and directed the Moretti Company to immediately discontinue any operations and not to resume until after they had submitted an application to the Corps of Engineers and received necessary Department of the Army permit.

There was, subsequent to this, several communications between the Moretti Company and the Corps of Engineers where the Corps of Engineers further advised the Moretti Company of the necessity of obtaining a permit before further work was done at this project if that work was to be done in the navigable waters of the United States.

Late in February of 1971, the Army Engineers at Jacksonville received an application for a permit for the Joseph G. Moretti Company submitted by Bailey, Glass and Post, an engineering firm. This application was prepared by Mr. James T. Glass, a professional engineer at that time with the firm Bailey, Glass and Post. Mr. Glass, through the study of aerial photographs of Hammer Point, Key Largo, and personal examination of the construction site, prepared a diagram of the proposed Moretti Company project. On this diagram, the mean high tide line, or mean high water mark, was indicated as it existed immediately before work was commenced.

This was determined by the use of aerial photographs and on-site inspections. Where that mean high water mark had been disturbed at the time the application and diagram were prepared, aerial photographs were used to make an approximate determination of where the mean high water mark had existed. Where this area was inhabited by mangrove stands which had been removed during the construction work, the outer or bayward edge of the mangroves, as illustrated by the photographs, was used in preparing the sketch of the high water mark, as shown in the diagram submitted by Glass.

Under those circumstances, therefore, the mean high water mark as shown in the application for a permit submitted by Glass, reflects the lowest or most bayward position of the mean high water mark possible according to information available when the sketch was prepared. In fact, the mean high water mark may have been considerably higher than indicated but it could not have been

further into the bay than shown on the sketch.

Much of the work for which a permit was requested had already been completed by the Moretti Company. In that respect, the application for a permit was characterized as "after the fact".

After the application was received by the Army Engineers at Jacksonville, Florida, and pursuant to statutory requirements, the Corps of Engineers publicly advertised the application and requested comments from concerned parties. Further, it contacted the United States Department of Interior, the Environmental Protection Agency and various state agencies soliciting their comments on the application. During the month of April, 1971, and in response to its public notices, the Corps received various letters from private citizens protesting the application for a permit by the Moretti Company. These objections were made known to the Moretti Company by letter on April 30, 1971 from Mr. McKnight, then Chief of Operations for the United States Corps of Engineers at Jacksonville. Early in May of 1971, Mr. Moretti, Sr., President of Joseph G. Moretti, Inc., responded to the Corps of Engineers regarding the letters of objection furnished to him by giving explanation to his activities at the Hammer Point project. During the period of time, specifically the months of April, May and June of 1971, the Army Engineers, the United States Department of Interior, the Environmental Protection Agency and other state and federal agencies conducted on-site inspections of the Moretti Company project.

It was determined through these inspections that a substantial amount of work the Moretti Company requested authorization for had already been completed. The comments of these agencies were received in time by the United States Army Corps of Engineers and there were several objections to the issuance of this permit. One of the reasons cited being that since the work was already completed in large part, to recommend approval would be providing official sanction to an illegal operation.

Late in May of 1971, the attorneys, then representing the defendant, Joseph G. Moretti, Inc., discussed their client's application for a permit with the United States Army Corps of Engineers in an attempt to persuade the Engineers to issue a permit authorizing certain aspects of proposed and already completed dredging work.

Nothing was resolved between the Corps of Engineers and the defendants up to this time, and for whatever reason, the defendants decided to resume their dredge and fill operation without a permit. Apparently, the work in Florida Bay had been halted by the defendants shortly after they were advised to do so by the Army Engineers in December and January. When the defendants resumed their dredge and fill work in Florida Bay, it proceeded at a furious pace and was not abated in spite of numerous objections from state and federal officials.

The defendant, Joseph G. Moretti, Jr., on July 15, 1971, was arrested on a complaint filed before the United States Magistrate, Miami, Florida, by Mr. Thacker Ross of the United States Corps of Engineers on a charge of illegal dredging (33 U.S.C. § 403) regarding his continued dredging at the Hammer Point location. In spite of the arrest, the Moretti Company continued to excavate and fill at Florida Bay to a point where at this time practically all of their originally proposed or planned dredging has been completed.

The mobile home park the defendants are developing, encompasses an area on Hammer Point, Key Largo, of well over fifty acres. All of the proposed lots are either situated on Florida Bay or connected to Florida Bay through a series of canals the Moretti Company has excavated. Further, there is what is called an access channel which is a canal the Moretti Company has excavated completely surrounding the perimeter of the Moretti property. All these canals and

channels were excavated by the Moretti Company during this construction. Moreover, there is what is also called an access channel connecting the Moretti Company property with the deeper water of Florida Bay. This channel was also excavated by the Moretti Company. All these channels were apparently excavated by the use of explosives to blast rock loose and then excavating with a dragline. The material that was removed from the bay was then used to fill in a considerable part of Florida Bay and elevate other portions of this property to a uniform grade several feet above the bay. This property in its natural state, that is before this development was begun, had been a nesting and feeding sanctuary for a large number of species of wading and shore birds. The Roseate Spoonbill, in particular, was very prevalent in this area. The bay in this area was very productive in producing numerous game and commercial species of fish; tarpon and snook were particularly abundant in this area. The shoreline was lined with living mangrove plants which were probably both of the red and black variety. The bay bottom was composed of an organic peaty substance which had accumulated through sedimentation caused by the wide variety of plant and animal organisms natural to this area. This peaty substance was considerably thick in this area and was probably the result of hundreds of years of natural sedimentation.

■ The immediate result of the development in this area was the complete removal and destruction of all living mangrove plants. With the loss of the mangroves, which are indigenous to the shores of the Florida Keys, went all wading and shore birds previously found in this area. The excavation of the access channels and canals by the defendants removed the peat natural to the bottom and exposed the underlining sand or rock.

Relatively shallow bay areas, such as Florida Bay at Hammer Point, in their natural state, serve as "nurseries" for many higher forms of aquatic life. Typically, the immature or larva forms of higher fish are swept or deposited in the shallow areas where they find protection and food which sustain them until they have sufficiently matured to survive in the deeper waters. In the shallow areas, they feed upon algae, fungi, and other simple life forms.

All forms of animal life depend upon growing plant communities as their food source. Specifically, in this area, the mangrove plants and the organic peaty bottom are absolutely essential to sustain an energy flow and a healthy marine ecosystem. Where mangrove communities exist, the energy input into the estuarine ecosystem is from the dead mangrove leaves and their biological degradation as they enter the waters. The decay and breakdown of those leaves supplies the energy upon which the lower forms of animal life feed and which in turn are utilized by the higher forms of marine life for their existence. In that sense, the mangrove plant supported by the peaty bottom is an essential element in the life cycle and the base of the pyramid upon which all higher forms of life in the bay areas rest. The destruction of the mangroves, therefore, results in the destruction of bay and sea life. Likewise, removal of the peat bottom exposes the dead sand and rock bottom which can sustain no life.

Furthermore, the defendants' extensive dredging of canals done without protective measures being taken, releases large amounts of silt, which is composed of crushed rock and sand. This silt is spread about the bay by tide, wave action and wind and as it is dispersed, settles back upon the bay bottom. This creates a situation where once the sand and rock was covered by the peat bottom, the silt covers the peat. In effect, this acts to suffocate the peat and other living vegetable forms. Further, as all plants require sunlight to carry out the process of photosynthesis, the clouding of the water by silt through

the dredging operations blocks off sunlight, which impedes and injures the growth of plant life in the bay. The destruction of peat, besides the effects already mentioned, also results in the killing of sea grasses, another form of vegetation in this area which serves to protect and nourish forms of animal life.

The activities of the defendants in the Hammer Point area resulted in all of the above damage to Florida Bay. The broad effects of such harm cannot result in anything but damage to commercial and sport fishing and a diminishing of the natural beauty and enjoyment of this area.

In all regards, the United States Army Corps of Engineers acted reasonably and in a normal manner toward the Moretti Company application. The Moretti Company was shown every possible consideration under the circumstances by the United States Army Corps of Engineers and in no way did the Army Engineers act in an arbitrary or unreasonable fashion towards the defendants. On the other hand, the defendants, in spite of numerous requests and orders from state and federal officials, acted in an unlawful and capricious manner. The defendant's haste in completing his illegal operations in Florida Bay are matched only by his disdain of the requirements imposed upon him by Sections 403, 406 and 407 of Title 33, United States Code.

Not only have the defendants ignored and violated statutes of the United States, but their actions have prevented timely studies of this area, particularly under the Fish and Wildlife Coordination Act of 1958, and the Environmental Policy Act of 1969, which would have been conducted had they applied for a permit from the Army Engineers prior to the commencement of this work. Further, their actions in dredging and removing much of the bay bottom and the removal of living mangrove plants greatly harmed Florida Bay's ecosystem.

The defendants have filled in and appropriated a significant portion of Florida Bay in this area for their own use. In that sense, they have reduced the capability of Florida Bay to sustain aquatic life as it did in its natural state.

The filling in of Florida Bay at Hammer Point by the defendants below the mean high water mark for the purpose of creating lots in their trailer park and the placing of "rip-rap" between the upland and bay portions of this filled-in land all constitutes the creation of a structure as contemplated by Title 33, United States Code, Section 406. United States v. Perma Paving Company, 332 F.2d 754 (2nd Cir.); Wyandotte Transportation Company v. United States, 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967). Further, should this fill, including the crushed rock and "rip-rap", placed bayward of the mean high water mark from where it existed before this trailer park development constructed by the defendants began, were removed, Florida Bay at this area in time would restore itself and increase its marine productivity eventually to its former condition.

## CONCLUSIONS OF LAW

A. The Court has jurisdiction over the subject matter and the parties to this action.

B. The activities described in the above Findings of Fact constitute violations of Title 33, United States Code, Section 403.

C. It is within the inherent powers of the Court to enjoin violations of the United States Code.

D. Florida Bay, at Hammer Point, Key Largo, Florida, is a navigable water of the United States. The federal test of whether a body of water is navigable depends on whether it is capable, in its natural form or with reasonable modifications, to sustain commerce or transportation. Davis v. United States, 185 F.2d 938, 943 (9th Cir.) cert. den., 340 U.S. 932, 71 S.Ct. 495, 95 L.Ed. 673 (1950). Under the federal test, there can be no question that Florida Bay at Hammer Point, Key Largo, is

**158**

a navigable water of the United States. See Miami Beach Jockey Club v. Dern, (1936) 65 App.D.C. 369, 83 F.2d 715, cert. den., 299 U.S. 556, 57 S.Ct. 17, 81 L.Ed. 409, holding Biscayne Bay is a navigable water of the United States.

■■ E. The authority of the United States over navigable water extends to the ordinary high water mark and any work done below this line without prior authorization is illegal. United States v. Kansas City Life Insurance Company, 339 U.S. 799, 70 S.Ct. 885, 94 L.Ed. 1277 (1950); United States v. Chicago, M., St. P. & Pac. R. R., 312 U.S. 592, 313 U.S. 543, 61 S.Ct. 772, 85 L.Ed. 1064 (1941). When excavation or filling is undertaken without authority from the Secretary of the Army as delegated to the Chief of Engineers, that constitutes a violation of Title 33, United States Code, Section 403. The Chief of Engineers has delegated authority to the District Engineers to issue certain types of permits and has set forth a criteria for obtaining permits. These criteria are published commencing at Section 209.120, Title 33, Code of Federal Regulations.

F. Section 10 of the Rivers and Harbors Act of 1899 (33 U.S.C. § 403) specifically states that work in navigable waters must be recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning same.

■ G. It is of no consequence that Congress has also provided criminal penalties for the acts committed by the defendants. The criminal sanctions provided by the Rivers and Harbors Act of 1899 are, except in violations of little consequence, inadequate. Where the sanctions of criminal liability are inadequate to insure the effectness of a statute designed to protect an interest of the United States, civil actions are proper notwithstanding existence of criminal penalties to protect the interests of the United States. Wyandotte Transportation Company v. United States, supra. Likewise, the Rivers and Harbors Act of

1899 is intended to prevent obstructions in the nation's waterways, id.

H. Section 406 of the Rivers and Harbors Act of 1899 provides in part:

And further, the removal of any structures or parts of structures erected in violation of the provisions of the said sections may be enforced by the injunction of any district court exercising jurisdiction in any district in which such structures may exist, and proper proceedings to this end may be instituted under the direction of the Attorney General of the United States.

■ Although Section 406 authorizes the removal of "structures" created in violation of Section 403, the language in Section 403 of Title 33, United States Code, specifically the use of the word "obstruction" is broad enough to justify the removal of any obstruction or any diminution of the navigable capacity of a waterway. Consequently, a district court has authority under the Rivers and Harbors Act of 1899 to order the navigable capacity of a waterway be restored. United States v. Republic Steel Corp., 362 U.S. 482, 80 S.Ct. 884, 4 L.Ed.2d 903 (1960).

■ The deposit of material in a navigable waterway is both an obstruction to navigation and a diminution of that waterway. Id. United States v. Perma Paving Company, 332 F.2d 754 (2nd Cir. 1964).

■ This is particularly valid when considered in the words of Justice Holmes: "A river is more than an amenity, it is a treasure." State of New Jersey v. State of New York, 283 U.S. 336, 342, 51 S.Ct. 478, 479, 75 L.Ed. 1104. The Act of 1899 is read charitably in light of the purpose to be served. United States v. Republic Steel Corp., supra.

■ I. In view of the Wildlife Coordination Act of 1958 and the Environmental Policy Act of 1969, the Court, in considering the Government's petition for an injunction, must consider the ecological impact to the area involved.

Zabel v. Tabb, 296 F.Supp. 764 (D.C. 1969), affirmed, 430 F.2d 199 (5th Cir., July 16, 1970).

J. This Court has the inherent power when it orders removal of fill placed in a navigable water in violation of Title 33, United States Code, Section 403, to enjoin the sale of that land while said fill is being removed.