**BANKERS LIFE AND CASUALTY COMPANY, etc., Plaintiff-Appellee,**

v.

**The VILLAGE OF NORTH PALM BEACH, FLORIDA, etc., et al., Defendants-Appellants.**

No. 71–3519.

United States Court of Appeals, Fifth Circuit.

Aug. 14, 1972.

As Modified on Denial of Rehearing Sept. 25, 1972.

Herbert D. Sikes, M. Stephen Turner, Tallahassee, Fla., for the State.

Herbert L. Gildan, West Palm Beach, Fla., for Village of North Palm Beach.

George R. Hyde, Atty., Dept. of Justice, Washington, D. C., Robert W. Rust, U. S. Atty., Kenneth G. Oertel, Asst. U. S. Atty., Miami, Fla., Kent Frizzell, Asst. Atty. Gen., Thomas L. Adams, Jr., Edmund B. Clark, Attys., U. S. Dept. of Justice, Washington, D. C., for federal appellants.

Ronald Sales, Evelyn R. Flack, Palm Beach, Fla., William T. Kirby, Chicago, Ill., for plaintiff-appellee.

Before TUTTLE, COLEMAN and CLARK, Circuit Judges.

TUTTLE, Circuit Judge:

These appellants complain of the order of the trial court ordering the Army Corps of Engineers to issue a permit for dredge and fill operations by the appellee, Bankers Life and Casualty Company on submerged land in Lake Worth, Florida. The land in question is wholly enclosed within the Village of North Palm Beach. Bankers also owned approximately 288 acres of land within the municipal limits of the Village, which land is riparian to Lake Worth, a navigable water of the United States which opens into the Atlantic Ocean. The order which Bankers sought, and which was a subject of the trial court's order, was to permit Bankers to dredge and fill an additional approximately 194 acres of the submerged land adjacent to its property by utilizing material from the bed of Lake Worth.

The history of this effort by Bankers to turn part of the waters of Lake Worth into land may be summarized as follows. On April 17, 1957, Bankers paid the Florida State Board of Trustees of the Internal Improvement Trust Fund of Florida (the state agency which at that time could appropriately deal with the matter) the sum of $26,000 for the use of 2,500,000 cubic yards of fill. Much of the fill, approximately 1,116,170 cubic yards, was consumed in the filling of other lands by Bankers and is not part of the subject matter of this action.

On February 15, 1957, Bankers applied to the Corps of Engineers for a permit to fill the property, and this was granted on or about April 29, 1957. There was nothing in the Federal Statutes at the time that required the Corps of Engineers to consider conservation, and there is nothing in the record to indicate that any study of possible ecological effects was made at that time. The permit which was issued carried the following statement on its face.

"That this instrument does not give any property rights either in real estate or material, or any exclusive privileges."

It also stated that:

"If the structure or work herein authorized is not completed on or before the 31st day of December, 1960, this permit if not previously revoked or specifically extended, shall cease and be null and void."

At the request of Bankers, the Corps, in December, 1960, extended the permit to

December 31, 1963.[1] The extension also contained the statement that if work authorized by the permit was not completed during the period of extension the permit would become null and void if not previously revoked or specifically extended. On December 16, 1963, the Trustees wrote the Corps a letter requesting that final consideration of Bankers' application for another permit extension be deferred pending Bankers' receipt of a local fill permit in accordance with Florida Statute Section 253.-124, F.S.A. The Corps agreed to defer Bankers' permit extension and on December 27, 1963, informed Bankers that it would not be possible to grant an immediate extension at that time because of Corps policy when there was local objection.[2]

For several years no further action was taken as between Bankers and the Corps of Engineers. During this time various attempted settlements of disputes were negotiated between Bankers, the State of Florida and the Village of North Palm Beach concerning the title of the submerged lands sought to be filled. On December 6, 1968 and March 17, 1969, Bankers corresponded with the Village in an effort to obtain a local fill permit. In June, 1969, the Village informed Bankers that a permit would be granted; however, shortly thereafter on July 10, 1969, the Village undertook to rescind this action.

By letter dated July 10, 1969, the same date as the meeting of the Village Council rescinding the action of June, Bankers addressed a letter to the Corps of Engineers stating that a permit had been received by letter from the Village of North Palm Beach and stating that "in as much as there were no other objections to the extension of the permit, as stated in your letter of December 27, 1963, to us, I trust this removes the final obstacle and you will grant the extension requested promptly."

The Corps of Engineers, obviously not desiring to resolve any underlying disputes as to whether the requirements referred to in the original request to the Corps from the Trustees had all been met, responded by letter of July 18, stating "it will still be necessary, however, that the written approval of the Trustees of the Internal Improvement Fund be furnished before further action can be taken on your application."

The status of the matter thus was that the state agency had requested that the application be held up in December, 1963. The Corps of Engineers had held

---

1. Prior to the granting of this extension, the 1958 Fish and Wildlife Coordination Act, 16 U.S.C.A. § 662(a) had become effective. Before this suit was filed seeking a mandatory injunction, the National Environment Policy Act of 1969, 42 U.S.C.A. §§ 4331–4347, had become effective. The effect of these statutes upon the functions of the Corps of Engineers is discussed infra.

2. This letter is reproduced as follows:
"With reference to your telephone conversation with Colonel Parfitt today concerning the pending extension of time of Department of the Army Permit No. 57–102 for the construction of bulk-head, dredging and filling in Lake Worth, information is furnished that no objections to the extension of time have been received from the standpoint of navigation and that it would be our plan to issue the requested time extension immediately upon termination of the notice period on 3 January, 1964 except for the receipt of a letter of the Trustees of the Internal Improvement Fund of the State of Florida under date of 16 December, 1963 requesting that final action be deferred pending granting of local fill permit in accordance with Section 253.124 of Florida Statutes of 1957.
"In view of the request of the Trustees of the Internal Improvement Fund it will not be possible to grant an immediate extension of time since Corps of Engineers policy is not to grant permits for work which is in contravention to state or local laws. However, we will be pleased to grant the extension promptly upon withdrawal of the deferral request by the Trustees of the Internal Improvement Fund. The lapse in the permit will have no effect insofar as the Corps of Engineers is concerned."
This document is signed by A. L. McKnight, Chief of Operations division.

it up, indicating that once the matters referred to in the state's letter were cleared it would be the purpose of the Corps of Engineers to proceed with an issuance of the extension. However, it was not until more than five years later that Bankers undertook to inform the Corps that it considered the conditions previously existing to have now been satisfied. The Corps of Engineers, quite appropriately, we think, deferred its action until it obtained a "go ahead" from the Trustees, the state body which had originally requested the deferment of the issuing of the permit.

Subsequently, Bankers instituted this suit requesting the district court to compel the district engineer, the Secretary of the Army and the United States to renew the permit or to issue a new permit.

The theory on which the plaintiffs' case was based was that the Corps of Engineers would have issued an extension of its permit but for the intervention of the Trustees; that the Trustees' request to the Corps to withhold the extension "pending granting of local fill permit in accordance with Section 253.-124, Florida Statutes, 1957," was a gratuitous interference by the Trustees in a matter in which, under existing Florida law, it had no power to act.[3]

The trial court accepted this theory. It held that the 1957 Act prohibiting the acquisition of submerged lands by dredge and fill methods was not applicable to Bankers and that neither the Trustees nor the Village had any authority to interfere with its continued operation so long as the Corps of Engineers kept its permit in effect. The trial court issued its mandatory injunction directing that the Corps of Engineers grant the permit without reference to the position either of the Village or the Trustees, and without any consideration of the effect on either the ecology or the Village or state interests that, during the period of inactivity by Bankers, had come much to the fore both in state and federal legislation relating to submerged lands. Cf. Zabel v. Tabb, 5 Cir., 1970, 430 F.2d 199. The court also decreed that Bankers be permitted to dredge and fill without permit from either Village or Trustees, and that, upon completion of such activity, title should be quieted in Bankers as to the lands thus created, all under the savings clause of the 1957 statute.

We have little difficulty in disposing of the government's appeal. The trial court clearly erred in enjoining the Secretary of the Army and the Corps of Engineers "to issue immediately to plaintiff, Bankers Life and Casualty Company, a good and sufficient extension of its permit to bulkhead and fill the submerged lands surrounding its real property, in accordance with all of the terms and conditions of the plaintiff's permit which expired on December 31, 1963, the term of the permit to be

---

3. Simply stated, the argument goes that under the so-called Butler Act of 1921, riparian owners could, by the act of filling submerged lands adjacent to their uplands, actually acquire title to the new-made land. The statute of 1957 abolished this procedure and established title to submerged lands in the state, provided that thereafter such lands could only be disposed of by procedures that were not attempted to be complied with in this case. Bankers contends, however, that it was exempted from the 1957 law by a savings or "grandfather" clause, which reads as follows:

"The provisions of this act shall not affect or apply to the construction of islands or the extension or addition to existing lands or islands bordering on or being in the navigable waters as defined in Section 253.12 herein of the state which was commenced or application for permit to fill which was filed with the United States Corps of Engineers prior to the effective date of this act . . . ."

Bankers contends that since it had the permit from the Corps of Engineers prior to June 11, 1957, the date of the Act, it was protected indefinitely thereafter in its right to proceed under the old law, so long as the Corps of Engineers continued to grant extensions. Bankers also claims to have *commenced filling* on June 11, 1957.

for three years from the date the permit is issued."

For the purpose of discussion of the government's appeal, we will assume that the Trustees incorrectly construed the 1957 statute as requiring Bankers to obtain a permit from the Village of North Palm Beach before dredge and fill operations could be undertaken within the village limits.[4] Nevertheless, no authority of any kind is cited to justify the court's decision that if the Trustees' objection to the extension of the Corps' permit was improperly based, the Secretary of the Army could be required by what is, in effect, mandamus, to issue a permit in light of all the ebbing and flowing of the tides of change with respect to the duty of the Secretary of the Army in dealing with requests for such permits, by the time Bankers got around to making an affirmative demand upon the Corps of Engineers for a renewal of the permit.

■■ Bankers, so far as this record discloses, was content to take no legal action to test the correctness of the Trustees' position or the Village's position for more than five years after being notified that the Corps of Engineers would not renew so long as objection was filed by the state agency involved. That five-year period, plus the time that elapsed before the entry of the final judgment in this case, is the point of time to which we must look. See Zabel v. Tabb, supra, where, speaking of the National Environmental Policy Act of 1969, 42 U.S.C.A. §§ 4331–4347, this court said:

"This Act essentially states that every federal agency shall consider ecological factors when dealing with activities which may have an impact on man's environment.

"Although this Congressional command was not in existence at the time the permit in question was denied, the correctness of that decision must be determined by the applicable standards of today."

Bankers is not in a position to complain if, during the period of its own lack of effort to force the matter to an issue, the requirements on the Corps of Engineers for the issuance of a permit, although still couched in terms of "navigation," included by the time the law suit was filed, much more stringent requirements.

It is clear that the district court had jurisdiction to entertain the claim against the officials of the Corps of Engineers as determined by the trial court. See Zabel v. Tabb, supra.

■ From what we have already said by reference to the Zabel case, supra, it is clear that the Corps of Engineers does not grant or deny a permit as a purely ministerial act. Even though the letter to Bankers stating that but for the objection raised by the Trustees, the extension would be granted, the letter makes it plain that the policy of the Corps of Engineers was not to grant such permit until such objection was withdrawn. This, of itself, made it plain that upon the finding of no obstruction in navigation, the Corps was using discretion based on other grounds than those normally strictly identified with navigation in determining under which circumstances it would issue a permit. In Zabel we have delineated further considerations that now must be given to such an application. The last two sentences of Mr. McKnight's letter read: "However, we will be pleased to grant the extension promptly upon withdrawal of the deferral request by the Trustees of the Internal Improvement Fund. The *lapse* in the permit will have no effect insofar as the Corps of Engineers is concerned." (emphasis added.) At best for appellee, these sentences are ambiguous since a lapsed permit cannot be extended. Certainly these sentences do not purport to make a commitment which would in any way bind the Corps of Engineers or the Secretary of the Army to disregard any circumstance other than the lapse of the

---

4. The correctness of the Trustees' Position will be discussed later in this opinion.

then existing permit in connection with the issuance of a new or "extended" permit.

Moreover, it seems clear beyond peradventure, that no statement made by Mr. McKnight could prevent the Corps of Engineers from complying with later requirements imposed by subsequent legislation on the issue of a permit regardless of the good faith of the official in writing the original letter. What did affect the Corps of Engineers was the deferral request by the Trustees. That request clearly was at least partially based upon ecological and environmental causes, which the Trustees considered they had the right to have dealt with before withdrawing their objection.

In the meantime, rather than filing a formal application with the Corps of Engineers, under which circumstances all of the inquiries which we have referred to at length in Zabel, would have to be made by the Corps before it could grant the permit, and without giving the Corps an opportunity to exercise its investigative and, at least partially, discretionary, powers, Bankers filed this action. The matter was not ripe for court action because the official of the government, who was empowered to act, had not been given an opportunity to perform the duties imposed on him by the federal statutes. As we said in Zabel:

> "When the House report [H.Rep. # 91–917, p. 5] and the National Environmental Policy Act of 1969 are considered together with the Fish and Wildlife Coordination Act [16 U.S.C. A. §§ 662(a)] and its interpretations, there is no doubt that the Secretary

can refuse on conservation grounds to grant a permit under the Rivers and Harbors Act." 430 F.2d 199, 214.[5]

The trial court erred in enjoining the United States officials.

Disposing of the federal claim does not, however, end the need for appellate review here. This is true because the trial court also entered a decree which would quiet title in Bankers to newly-made lands, where formerly tidal waters flowed, contrary to what the Trustees and the Village authorities believed to be the applicable state law. We have held that, to resolve the Federal issue, we do not feel it necessary to decide whether Bankers was within the exemption of the 1957 statute putting an end to the acquisition of submerged lands in the manner in which Bankers here sought to accomplish it. This was so, because, as we have indicated, the Trustees were authorized to act as they did, even if they were in doubt, or even if there should have been doubt in their minds, as to whether the 1957 statute did exempt Bankers from its application.

Since this matter relates to a serious question of title to submerged lands under somewhat unique and unlitigated Florida statutes we are reluctant to construe more of these laws than necessary in order to assure the parties that the judgment of the trial court has been adequately disposed of. For the reasons hereafter stated, it becomes necessary for us to construe only a small part of the statutory language and place it to determine that the decree quieting title in Bankers must be set aside and that

---

5. The government also contends that even though the extension had been granted in 1963, as requested by Bankers, it would have no more effect than the original permit and as to this, the United States contends that it would be revocable at will, citing for that proposition the case of Miami Beach Jockey Club v. Dern, 65 App.D.C. 369, 83 F.2d 715, cert. denied 299 U.S. 556, 57 S.Ct. 217, 81 L.Ed. 409, and United States v. Chandler-Dunbar Water Power Co., 229 U.S. 53, 33 S.Ct. 667, 57 L.Ed. 1063. The government thus says that even though the letter stating that it was the purpose of the Corps of Engineers to issue the permit under certain circumstances would be binding, this could not be any stronger than the permit itself, and, thus, no estoppel could arise even though an official, with authority to act, had expressly stated that such permit would be granted. We need not reach this point in order to decide that the case was not ripe for any injunctive or mandatory procedure against the federal defendants.

phase of the case remanded to the trial court for further proceedings.

In order to pose the issue as simply as possible, we state the contentions of the parties. It is undisputed that prior to the Act of 1957, which went into effect on June 11 of that year, a riparian owner could extend his lands over submerged lands adjacent thereto out to what we will simply denominate as "the channel." This is variously described as "the bulkhead line" or "the channel" for navigation. By the Act of 1957, the state legislature undertook to abolish this means by which riparian owners could acquire title to accretions to their lands by filling in to the bulkhead line. The statute expressly reclaimed title in the Trustees of the Internal Improvement Trust Fund of the state of Florida for all such submerged lands. It made provision for the manner in which such lands could thereafter be disposed of, even to riparian owners.

The disagreement comes by virtue of the fact that Section 11 of the 1957 Act provides as follows:

"The provisions of this act shall not affect or apply to the construction of islands or *the extension or addition to existing lands* or islands bordering on or being in the navigable waters as defined in section 253.12 herein of the state *which was commenced or application for permit to fill which was filed with the United States corps of engineers prior to the effective date of this act,* as to the lands or bottoms." (Emphasis added). Chap. 57–362, General Laws of Florida, 1957.

It is undisputed that on June 11, the effective date of the Act, Bankers had received a permit, issued in April, 1957, granting permission to dredge and fill the lands adjacent to those which were held by it as riparian owners. It is also conceded that Bankers purchased from Trustees 2,500,000 cubic yards of fill material to be dredged from the bed of Lake Worth, and that "in 1957, 1958 and 1961" Bankers filled a portion of its submerged lands under this permit. It is also agreed that this permit expired by its own terms at the end of three years, or on December 31, 1960, and that it was renewed by the Corps of Engineers for an additional three years, thus expiring on December 31, 1963. Bankers' first argument is that the application for permit to fill which was filed with the United States Corps of Engineers prior to the effective date of this Act," encompasses the situation in which it found itself in that it not only had filed such application, but it actually had received a permit. It says that this permit was then extended for an additional three-year period, and would automatically have been extended for an additional period, but for the "illegal" intervention by the Trustees when they asked the Corps of Engineers not to give consideration of such further extension until such time as Bankers complied with Section 253.124, Florida Statutes, F.S.A. (described above).

Of course, it is Bankers' position that by virtue of the exemption in the 1957 Act there was no requirement that Bankers comply with such section. While for the purpose of this discussion we may agree that, as to the first three year permit, Bankers would fall strictly within the exemption language of the 1957 statute, the Trustees make a strong case for the proposition that the statute section must be construed strictly since such savings clause continued divestment of public lands in derogation of what has under the general provision of the law become a sovereign trust, citing State ex rel. Davis v. Love, 99 Fla. 333, 126 So. 374 (1930), 3 Sutherland, Statutory Construction, Sections 5501–06; 4937, 6503, 3rd Edition (1943). The Trustees take the position that the savings clause exempting from the operation of the new statute those who had a pending application for a permit before the Corps of Engineers be construed in any manner which would result in giving the exempted riparian owner any greater rights than were actually contained in the permit when is-

sued; that the permit which, in this case, had already been issued, expired by its own terms in 1960; that any application thereafter for such a permit or extension would not activate the exemption because such application would not have been one which had been "filed with the United States Corps of Engineers prior to the effective date of this Act." Thus, the Trustees say, it would stand with an application for extension made in December, 1963, the one on which Bankers here must base their case. Moreover, the Trustees, in effect, state that the power of the court to require the issuance of a permit at the time of trial must be faced at the time when the new application was made to the Corps of Engineers, after Bankers claimed to have received a valid permit from the Village of North Palm Beach. This application was formally made on July 20, 1969. The Trustees undertake to bolster their position with respect to this view by citing an opinion of the Attorney General of the State of Florida to the following effect:

"(1) The holder of an unexpired U.S. permit qualified to fill under Section 253.0013(2), FS. [F.S.A.], but who has not filled, is permitted to fill the submerged land as limited by the permit which he holds. If he desires to purchase rather than to exercise his right to fill, the provisions of the bulkhead law are applicable and there must be compliance with requirements for notice and advertising.

"(2) Where a permit has expired or is extended by the Corps of Engineers subsequent to June 11, 1957, we feel that the provisions of the statute have not been met and that the exceptions from the provisions from the so-called bulkhead law are not applica-

ble. The applicant must then purchase as required by law. . . .

"(5) Since the exemption is to be strictly construed, any change in the permit as originally issued, whether by way of extension of time or area covered, is not in compliance with the exception of the statute. The holder of the permit as modified or extended has no right to be accepted under Section 253.0013(2) FS." 1960 Attorney General Reports, 617–619.[6]

The Trustees further bolster their contention by referring us to what they call "the long standing administrative interpretation set forth in Rule 18–2.11 (formerly Rule 200–2.11) Florida Administrative Code." This interpretative section provides *Limitation defined for exemption under Section 253.0013(2) FS.* Exemptions set forth in Sections 253.0013(2) (FS) are operative only for (1) the unexpired period of the U.S. Army Corps of Engineers permit in effect June 11, 1957, or (2) the initial permit period for which the U.S. Army Corps of Engineers granted a permit pursuant to application pending June 11, 1957 and such exemptions will not be subject to extension."[7]

We have gone into some length in discussing whether the exemption in the 1957 statutes applies to Bankers to indicate that, at the very least, the Trustees may properly have had the legal opinion that they should intervene with respect to the proposed extension of the Corps of Engineers permit in December, 1963. Bankers relies, as they say in the brief, "strongly" on the case of Bay Shore v. Steckloff, 107 So.2d 171 (Fla.App. 1958). We find that this case does not touch on the issue which is contended for by the Trustees here. It is clear that in Steckloff the District Court of

6. While Bankers say that the Attorney General is, in effect, a party to the litigation, and his opinion should have no more weight than the opinion of any other lawyer, at least we do note that this opinion was *ante litem motam.*

7. While we are told by counsel for the Trustees that this Administrative Code was first adopted in 1962 upon passage on the Florida Administrative Procedure Act, Chapter 120, Florida Statutes, F.S.A., we are not given the benefit of any further indication as to the weight, if any, which should be given to such administrative rules or regulations under the Florida law.

Appeals in Florida held that a riparian owner who found himself strictly within the language of the exemption section of the statute, that is, one who had an application actually pending before the Corps of Engineers at the time of the effective date of the law, was entitled to dredge and fill under the old law during the period of the permit actually granted by the Corps as a result of the application which was pending on June 11, 1957. This does not reach the question whether a subsequent application for extension would bring such land owner within the provisions of the exempting section.

We do not attempt to solve this question of Florida statutory construction dealing with submerged lands. We should not do so, because of a strange quirk of the case that we note upon a careful reading of the record and comparing it with the findings of the trial court. In what it denominated "findings of fact and conclusions of law," the court said in paragraph 13: " . . . It is the opinion of the court that the Trustees [in requesting a deferment by the Corps of Engineers] acted contrary to State law. Bankers had previously obtained a permit *and had commenced filling the land now in question* prior to June 11th 1957, the effective *date of the law that the Trustees now rely upon.*" (Emphasis added.)

The pre-trial stipulation which appears to have been filed on December 20, 1970, contains a section titled "Concise Statement of Stipulated Facts Which Will Require No Proof at Trial, With Reservations, if any." Paragraph 11 contains the following statement: "All parties were *unable to agree* whether shortly after the permit was issued, plaintiff Bankers began to fill the real property and submerged lands surrounding the real property and continued these filling operations until its dredge sank sometime later in the years 1957–58." (emphasis added) Under a section entitled "Statement of Issues of Fact Which Remain to be Litigated at Trial" of the same stipulation, Paragraph 9 includes as one of the issues to be litigated at trial "whether Bankers began to fill the real property and the submerged land surrounding the real property and continued these operations until its dredge sank in 1957 or 1958." Then on March 17, 1971, and apparently during the course of the trial, at the court's suggestion, the parties filed a stipulation paragraph 2 of which contains the following statement:

"Under the United States Corps of Engineers permit hereinafter mentioned, plaintiff has filled that portion of the property crosshatched in blue on the map and part of the isthmus between Munyon Island and the upland [this would be part of the lands with which we are here dealing.] Plaintiff does not have a deed to the area crosshatched in blue on the map. *The filling took place after June of 1957* and was completed prior to December 31, 1963." (emphasis added)

Notwithstanding this explicit statement that the filling had taken place after June, 1957, the trial court was somehow persuaded to include in its findings of fact the statement quoted above from paragraph 13, "Bankers . . . had commenced filling the land now in question prior to June 11, 1957, the effective date of the law that the Trustees now rely upon." This same inconsistency appears in Bankers' brief filed in this court. Under a section in the brief entitled "Statement of the Facts," there is contained a sub-heading "Summary of the Facts Contained in the Stipulation for an Agreed Case and the Exhibits." In that section of the brief there is no statement to the effect that any of the filling had commenced prior to June 11, 1957. The statement is:

"On or about April 29, 1957, the Corps granted Bankers' permit Number 800–61 (57–103) to fill the submerged lands surrounding the real properties out to the bulkhead lines. Bankers filled the real property and the submerged lands surrounding the real property under the permit *in the years 1957, 1958 and 1961.*"

Under a succeeding section, prior to the section entitled "Argument" there is what is stated to be a "Summary." One paragraph of this summary states as follows:

> "On June 11, 1957, the Corps gave Bankers a permit to fill the submerged lands. *Prior to that date* Bankers filled in some of the submerged lands. Bankers is within the savings clause in FS § 253–135(2) 1969."

A careful reading of this record leaves us without any doubt that the date of June 11, 1957 was so critical with respect to the time of the commencement of the filling of the submerged lands [8] that it is incomprehensible to this court how such misstatement of the facts could occur.

However it may be, the finding of the trial court is clearly erroneous, for it is contrary to the stipulation entered into by the parties. Because of this fact, the judgment of the trial court to the effect that the exemption covered Bankers by reason of the commencement of filling prior to June 11, 1957 cannot be the basis for a judgment or decree interpreting the Florida statute. We consider it appropriate that this entire issue be remanded to the trial court for further consideration in light of the facts as disclosed by the record. This will also enable the parties more fully to develop their respective positions touching on the weight to be accorded to the regulations which we have discussed above and consider any other developments in the Florida law with respect to titles to submerged lands. None of the parties has suggested that this court submit this question by certification to the Supreme Court of Florida as authorized under the Florida statutes. Nevertheless, if the trial court should deem it appropriate the court may withhold a decision with respect to this matter of land titles in Florida pending an oppor-

tunity to be given to the parties to litigate this issue in the state courts.

The judgment of the trial court is vacated and the case is remanded to the trial court with directions to dismiss the suit for injunction against the officials of the Army and the Corps of Engineers and for further proceedings with respect to the claim of the plaintiff for a quieting of its title as may be consistent with this opinion.

---

8. Arguably, if the filling had started prior to June 11, 1957, there would be a literal exemption within the statute, without regard to the duration of the Corps of Engineers' permit.