UNITED STATES of America, Plaintiff,

v.

JOSEPH G. MORETTI, INC., Defendant.

No. 71-1176-Civ-WM.

United States District Court,
S. D. Florida.

Nov. 19, 1976.

Robert W. Rust, U. S. Atty., by David F. McIntosh, Asst. U. S. Atty., Miami, Fla., for plaintiff.

Kenneth L. Ryskamp, Maimi, Fla., for defendant.

## MEMORANDUM OPINION

MEHRTENS, District Judge.

## I. THE CAUSE OF ACTION

THIS CAUSE (hereinafter, *Moretti II*) came before the Court on remand from the Fifth Circuit, 526 F.2d 1306 (1976), for an evidentiary hearing on the manner of restoration to be performed by Moretti, Inc., affording defendant Moretti, Inc. an opportunity to present its objections to the feasibility and environmental advisability of the remedial restoration order to be undertaken. Id. at 1310.

## II. FINDINGS OF FACT

Prior to this evidentiary hearing, the parties had conferred, deposed each other's witnesses, and exchanged environmental reports.

Dr. Arnold Banner, an exceptionally well-qualified marine biologist for the U.S. Fish and Wildlife Service, presented a comprehensive evaluation of environmental effects from the defendant corporation's 84-acre Hammer Point development and a suggested plan of restoration. Dr. Banner's study confirmed and quantified the Court's previous findings set forth in *United States v. Joseph G. Moretti, Inc.,* 331 F.Supp. 151, 156 (SD Fla.1971) and summarized by Chief Judge Brown and Circuit Judges Goldberg and Morgan thusly:

> 3. Without a doubt the Judge was moved because of ecological not navigational factors. He found that the adverse ecological consequences of the dredging and filling operation included the destruction of habitats of a large number of wading birds (including roseate spoonbills, reddish egrets and herons), removal of peat from the bottom of the bay deleteriously affecting the ability of the shallow water to support marine life, elimination of mangroves which play an important role in the ecology of the area, and significant injury to sport fishing in the area.

*United States v. Joseph G. Moretti, Inc.,* 478 F.2d 418, 421, note 3 (5th Cir. 1973) (hereinafter, *Moretti I*).

Dr. Banner quantified part of the defendant corporation's environmental destruction at Hammer Point as a loss of 100 pounds of fish per acre per year; i. e., a loss of 8,400 pounds of fish each year. (There has been a loss of 50,400 pounds of fish during the six years this cause has been in litigation; i. e., 8,400 pounds of fish/year × 6 years). It was not possible to quantify the yearly loss of plant or animal organisms because of the periodic reduction of dissolved oxygen in the Hammer Point canals below the minimum Federal and State standards to lethal levels, nor was it possible to quantify the total loss of Hammer Point's aesthetics such

as the presence of wading and shore birds previously found in the area (*United States v. Joseph G. Moretti, Inc.,* 331 F.Supp. 151, 156; *Moretti I* at 421, note 3), although aesthetics is certainly a factor to be considered in its own right and in the general public interest of a tourist-oriented economy such as the Florida Keys. *Moretti I* at 423. Without fish and wildlife, the Florida Keys obviously would have little or no attraction.

The defendant corporation's witnesses corroborated Dr. Banner's findings that live juvenile marine organisms were only found in numbers among the seagrasses along the horizontal ledge at -3′ MSL to -4′ MSL in the Hammer Point canals; that seagrasses grew well on the horizontal surfaces located at -3′ MSL to -4′ MSL along the canal ledge mentioned above and also at -6′ MSL to -10′ MSL on the bottom of the shallow east-west canal which transits the end of the long peninsula; defendant's ecologist, Dr. Rich, also measured lethal levels of dissolved oxygen in the Parcel "A" canals.

The Government's remedial restoration plan as set forth in "Restoration Sketch Plan # 2A by Dr. Banner, 11 October 1976," would require the defendant corporation to:

1. Shallow the north-south canals in (inhabited) Parcel "A" to an average depth of -7′ MSL; i. e., -8′ MSL at the mouths sloping upward to -6′ MSL at the dead-ends.

2. Shallow the perimeter and the entrance channels in Parcel "A" to -8′ MSL.

3. Shallow the perimeter and the east-west canals in (uninhabited) Parcel "B" which have the advantage of a mixing caused by the prevailing winds to an average depth of -8′ MSL.

4. Certain shallow portions of two of the Parcel "B" canals and the shallow east-west canal which transits the end of the long peninsula in Parcel "A", presently containing seagrasses, would remain undisturbed.

5. The land fill in Parcel "B" seaward of the original Mean High Tide Line (as previously agreed upon by the parties and accepted by the Court) would be removed and a mangrove fringe would then be planted along the original Mean High Tide Line and also along the length of the southern bank of the southernmost canal in Parcel "B".

Opposing ecologist, Dr. Rich, while initially taking the position that the loss of approximately 84 acres of habitat at Hammer Point was "trivial" compared to his estimated 1,300 square miles contained in Florida Bay, eventually agreed with Dr. Banner's proposed restoration plan (attached hereto) with two exceptions: (1) Dr. Rich would reduce the Parcel "A" canal depths to -8′ MSL at the dead-end sloping to -10′ MSL at the mouth in lieu of Dr. Banner's -6′ MSL to -8′ MSL. As Dr. Rich's depth measurements were not taken vertically but admittedly were taken with a horizontal component over the canal ledges, the more favorable conditions which Dr. Rich believed to be at -8′ MSL to -10′ MSL were actually at considerably shallower vertical depths, such as the -6′ MSL to -8′ MSL depths proposed by Dr. Banner for restoration of the Parcel "A" canals; (2) Dr. Rich opposed removing the unoccupied land fill below the pre-existing MHTL in Parcel "B" on economic grounds. As Dr. Rich admitted that he had not made himself aware of the finances involved, but his opinion was based entirely on "What Joe (Joseph G. Moretti, Jr.) told me," Dr. Rich's uncorroborated second exception is without merit.

Mr. Pierce Maxwell Higgs, civil engineer, architect, and cost estimator for the U. S. Corps of Engineers testified that in his opinion the cost of the Government's proposed restoration plan to the defendant corporation would be $454,000 (if performed by the Government, $603,000). Mr. Higgs' estimate was based upon the average depth of the canals which he personally sounded and computed to be -16′ MSL. Mr. Joseph G. Moretti, Jr. disputed Mr. Higgs' average -16′ MSL depths but Mr. Moretti, Jr. had neither taken personal soundings nor had soundings been taken for him, except perhaps the obviously inaccurate and excessive "depths" used in Dr. Rich's ecological re-

port. In any event, the defendant corporation and Mr. Moretti, Jr. had previously stipulated that the Court's prior restoration order of December 20, 1974, would cost the defendant corporation almost exactly $1,000,000.00, while Mr. Moretti, Jr. stated at his deposition the day prior to the instant trial that the defendant construction corporation could probably complete the Government's presently proposed restoration plan at less than Mr. Higgs' estimate of $454,000.

At the trial, Mr. Moretti, Jr. did not present any alternative restoration plan on behalf of his defendant corporation—nor was he obliged to do so—but, Mr. Moretti, Jr. took the initial position that it would be engineeringly *impossible* to replace fill in the canals; his intermediate position was that it would be *burdensome* to replace fill in the canals without the cooperation of the lot owners in Parcel "A"—although neither the occupants of the lots along the canals in Parcel "A", nor the owners of the vacant lots at the strategic dead-ends of the canals in Parcel "A" were ever approached on behalf of the defendant corporation; his final position was that it would be *expensive and non-profitable* to replace fill in the canals.

The testimony of Mr. Moretti, Jr. and the deposition and exhibits of defendant's longtime accountant, Francis E. Rawls, CPA entered into evidence by stipulation, shed much light on the defendant corporation's finances and ownership:

1. The defendant corporation has been inactive since the beginning of this lawsuit in 1971, with one notable exception discussed *infra,* yet Mr. Moretti, Sr., who "goes to meetings and keeps the books," and Mr. Moretti, Jr. who had the defendant corporation build a warehouse for himself, the only two shareholders of the defendant corporation, drew combined salaries of $150,000.00; i. e., $25,000/year for 1971–1974 for Mr. Moretti, Sr. and $25,000/year for 1971–1976 for Mr. Moretti, Jr. There have been no other stockholders in this closely-held corporation, and Mr. Moretti, Jr. was uncertain of the actual division of

stock but believed it was 60% Moretti, Sr. and 40% Moretti, Jr.

2. The only significant work performed by the defendant construction corporation from 1971 to the present was the building of a quarter-million-dollar warehouse for Mr. Moretti, Jr. personally, with the profit to the defendant corporation, if any, yet to be decided upon an all-in-the-family basis between Mr. Moretti, Sr. and Mr. Moretti, Jr.

3. The defendant corporation's financial statement of January 31, 1976, showed "current receivables" (from mortgages and contracts for deed) of $242,897 and, certainly, there were similar current receivables in each of the six years during 1971–1976 as the defendant corporation has made no additional sales during that period. Yet the "stockholders equity" (also called "net worth") as of January 31, 1976, was only $184,375 which does not approach the defendant corporation's estimated six-year income of $1,457,382 ($242,897/year × 6 years). An inactive corporation with one black telephone, one room, no secretary, and no jobs cannot justify yearly "administrative expenses" of $103,350.

4. The net worth of the defendant corporation as of January 31, 1976, is highly misleading. If the actual appraised value of $950,000 (as Moretti, Inc. represented to the Court at its supersedeas bond hearing), is substituted for the historical cost of the land remaining to be sold, the defendant's net worth becomes $891,375 ($184,375 + 950,000 − 242,894). And, if the artificial liability of $95,116, "Loans payable to stockholders" is ignored, the net worth of the defendant becomes $986,491 ($891,375 + $95,116).

While a net worth of almost one million dollars does not convert into cash on a one-for-one basis, the defendant corporation has discounted receivables to raise cash on prior occasions.

Finally, it is noted that the defendant corporation did not claim surprise at the Government's plan, did not thereafter request a recess or adjournment to study the

plan, and did not renew its objection to the proceedings at the conclusion of all the evidence.

## III.  CONCLUSIONS

During the two-day trial of the above-styled cause, the United States has met the criteria set forth by the Fifth Circuit in *United States v. Joseph G. Moretti, Inc.,* 526 F.2d 1306 (5th Cir. 1976) (hereinafter, *Moretti II* ; *Fred Weiszmann v. United States,* 526 F.2d 1302 (5th Cir. 1976); and *United States v. Sexton Cove Estates, Inc.,* 526 F.2d 1293, 1301 (5th Cir. 1976):

1.  The Government has made and presented to the Court a complete, comprehensive examination of both the environmental factors involved and the practicalities of the situation.  *Moretti II* at 1310, *Weiszmann* at 1304.

2.  Moretti, Inc. has been afforded an opportunity to present its objections to the feasibility and environmental advisability of the Government's proposed restoration plan [and to present any Moretti, Inc. alternative restoration plans].  *Moretti II* at 1310.

3.  The Government has presented a proposed restoration plan carefully designed to confer maximum environmental benefits, at the same time tempered with a "touch of equity" considering the degree and kind of wrong and the practicality of the remedy. *Sexton Cove Estates* at 1301.

4.  The Government has presented a proposed plan which is not beyond the resources of Moretti, Inc.  *United States v. Sunset Cove, Inc.,* 514 F.2d 1089, 1090 (9th Cir. 1975), cited in *Sexton Cove Estates* at 1301.

5.  The Government's proposed restoration plan would not interfere with the access to Florida Bay, ingress, egress, boating, bathing, or fishing of the individual lot owners at Hammer Point.  *Sexton Cove Estates* at 1300.

6.  Additionally, the Government's proposed plan has been confined to those areas where the District Court and the Fifth Circuit have specifically found and affirmed restorative jurisdiction;  viz, the filled areas of Parcel "B" bayward of the pre-existing MHTL (*Moretti II* at 1309); and, the topography where the canals are now situated both above and below the pre-existing MHTL (*Moretti II* at 1310).

7.  Dr. Banner's proposed restoration plan would, with certainty, meet the minimum Federal and State water quality standards in the defendant corporation's canals and compensate in small part for the extensive loss of food and habitat for juvenile fish.  Based upon his observations at the Hammer Point development and at other canal restoration projects in the Florida Keys, Dr. Banner was confident that algae would cover the shallowed Hammer Point canal bottoms within one year, followed by highly beneficial and productive seagrasses within five or six years.  Dr. Banner was also confident that mangroves, algae, and eventually seagrasses would cover the restored landmass in Parcel "B" bayward of the original MHTL.

THEREFORE, despite the prior findings of Judge Brown and Circuit Judges Goldberg and Morgan:

.  .  .  Moretti violated the Act flagrantly and our settled conviction that mandatory affirmative relief requiring a burdensome performance is statutorily and *equitably* appropriate on these facts .  .  .  . [Emphasis supplied]  *Moretti I* at 421; and,

Despite the bleeding of the defendant corporation's assets by its two stockholders during this lawsuit (1971 to the present); and,

Despite the maxim that one receiving equity should do equity—which the defendant corporation has obdurately refused to even consider;

The United States has presented a practical restoration plan no more burdensome than necessary to insure meeting the minimum water-quality standards, and, in small part, compensating for the defendant's de-

struction of habitat. The Government's proposed plan protects the individual lot owners of Parcel "A", permits Moretti, Inc. to retain all canals in both Parcels "A" and "B", and makes available for sale 48 waterfront lots in Parcel "B". The Government's proposed plan is by Mr. Moretti's own estimates less than half the defendant's estimate of the cost of the prior plan ordered December 20, 1974, and is capable of being accomplished by good faith use of the defendant's current and long-term receivables of $446,000 (January 31, 1976, "current receivables" $242,897 + "long-term receivables" $298,749) without using any of the defendant's "land available for sale" (appraised at $950,000), and without determining at this time if assets of the defendant corporation were wrongfully diverted to the personal use of the two stockholders to thwart any restoration plan.

Comparing the "Restoration Sketch Plan" with the testimony of Dr. Banner and Dr. Rich, the Sketch Plan appears to be in error in that the canal in Parcel "B" containing some seagrasses should be the middle canal. The Court will correct the Sketch Plan prior to the Plan being incorporated in a separate Final Judgment and Order.

A Final Judgment and Order will be issued consistent with the foregoing.

## FINAL JUDGMENT

For the reasons previously set forth in the Court's concurrent memorandum opinion in the above-styled matter, it is

ORDERED and ADJUDGED that the defendant corporation, Joseph G. Moretti, Inc., shall within 60 days from the date of this order comply with the Government's remedial restoration plan set forth in Exhibit "G 10," "Restoration Sketch Plan # 2A by Dr. Banner, 11 October 1976," which is incorporated by reference and made a part of this order; specifically, the defendant corporation shall:

1. Shallow the north-south canals in (inhabited) Parcel "A" to an average depth of -7' MSL; i. e., -8' MSL at the mouths sloping upward to -6' MSL at the dead-ends with no depth greater than -10' MSL.

2. Shallow the perimeter and the entrance channels in Parcel "A" to an average depth of -8' MSL with no depth greater than -10' MSL.

3. Shallow the perimeter and the east-west canals in (uninhabited) Parcel "B" (which have the advantage of a mixing caused by the prevailing winds) to an average depth of -10' MSL, with no depth greater than -12' MSL.

4. Not disturb certain shallow portions of two of the Parcel "B" canals and the shallow east-west canal which transits the end of the long peninsula in Parcel "A," which presently contain seagrasses.

5. Remove to an average depth of -2' MSL the landfill in Parcel "B" seaward of the original Mean High Tide Line (as previously agreed upon by the parties and accepted by the Court) and plant mangrove fringes along the original Mean High Tide Line in Parcel "B" and also along the length of the southern bank of the southernmost canal in Parcel "B"; and it is

ORDERED and ADJUDGED that the above-described restoration shall be accomplished in the manner least disruptive to the environment, e. g. using turbidity screens, and with one week's advanced notice to the U. S. Army Corps of Engineers who may have reasonable access to Hammer Point to observe and inspect the work; and, it is

ORDERED and ADJUDGED that an equitable lien for the performance of the above-described restoration shall be and the same is hereby established on all of the defendant's land at Hammer Point, also called Hammer Point Subdivision, located in Sections 22 and 27, Township 62 South, Range 38 East, Key Largo, Monroe County, Florida, except on those individual lots in Parcel "A" sold or under contract for deeds prior to 1975; and, it is

ORDERED and ADJUDGED that an equitable lien for the performance of the above-described restoration shall be and the same is hereby established against all the assets of the defendant corporation, includ-

ing but not limited to all current and long-term receivables; and, it is

ORDERED and ADJUDGED that all income of the defendant corporation shall hereafter be placed in the trust account of the defendant corporation's attorneys, Bolles, Goodwin, Ryskamp, Welcher & Carrier, P.A., for the payment of reasonable and necessary expenses of the inactive defendant corporation (including reasonable legal fees); however, there shall be neither payments of wages, dividends or expenses nor repayment of "loans" from the defendant corporation's assets to the two officer-stockholders of the defendant corporation without further order of the Court; and, it is

ORDERED and ADJUDGED that the above-described equitable liens on lands and other assets shall also serve as a supersedeas bond in the event this remedial restoration order is appealed; and, it is

ORDERED and ADJUDGED that should the defendant corporation not fully and timely comply with this order, the U. S. Army Corps of Engineers may thereafter complete any undone provisions of this order and be reimbursed therefor from the assets of the defendant corporation; *United States v. Cargill,* 367 F.2d 971 (5th Cir. 1966), affmd. *sub nom; Wyandotte Transportation Co. v. United States,* 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967); and, it is

ORDERED and ADJUDGED that either party may apply to the Court for appropriate relief should any dispute arise from the enforcement of the terms of this order.

[See following illustration]

RESTORATION SKETCH PLAN # 2A (MODIFIED)
(BY DR. BANNER - 11 OCT. 1974 - Sh. 1 OF 1)

NOTES:
1. EXISTING AVERAGE BOTTOM ELEVATION OF ALL CANALS & CHANNELS ± EL. -16.0'
2. IN PARCEL "A" - FILL CANALS TO AV. BOT. EL. -7.0', AND CHANNELS TO AV. BOT. EL. -8.0'
3. IN PARCEL "B" - FILL ALL CANALS AND CHANNEL TO AV. BOT. EL. -10.0'
4. THE WORD "LEAVE" SHOWN ON PLAN, MEANS NO WORK TO BE DONE
5. IN PARCEL "B" - REMOVE EXIST. LANDFILL FROM EL. +3.0' DOWN TO EL. -2.0'
6. IN PARCEL "B" - PLANT RED MANGROVE, AS SHOWN

APPROX. SCALE
0    500'    1000'

LEGEND:
— · · — BOUNDARY LIMITS OF PARCEL "A" & "B"
CANALS & CHANNELS TO BE FILLED
LANDFILL TO BE REMOVED
MANGROVE FRINGE TO BE PLANTED

CANAL (TYP.)

PERIMETER CHANNEL

PARCEL "A"

US HWY # 1 (4 LANE)

ATLANTIC OCEAN

LEAVE

N

PARCEL "B"

PERIMETER CANAL

CANAL (TYP.)

1481

G10